[L. A. No. 17907. In Bank. Mar. 5, 1942.]

ROY CAMPBELL, as Trustee, etc., Respondent, v. A. OTIS BIRCH et al., Appellants.

George Acret, Clyde F. Murphy, Clifford A. Rohe, Robert W. Kenny and Morris E. Cohn for Appellants.

Syril S. Tipton for Respondent.

PETERS, J. pro tem.—This action was brought by plaintiff for damages alleged to have been suffered by the trust estates represented by plaintiff as the result of an alleged fraudulent conspiracy by defendants whereby plaintiff was induced to settle an indebtedness of defendant A. Otis Birch owed to the trust estates for less than the amount due thereon, and to reduce the rental payable under a lease held by defendant A. Otis Birch on certain real property owned by the trust estates. The trial court found in detail that the compromise and modification agreements were entered into as a result of certain false and fraudulent representations made to Campbell concerning Birch's financial condition; that such representations were made pursuant to a conspiracy by defendants to induce plaintiff to accept the compromise and modification agreements; and that plaintiff relied thereon to his damage. Based on these findings, judgment was entered in favor of plaintiff, from which judgment defendants prosecute this appeal.

The main contention of appellants is that the basic findings of the trial court are not supported by the evidence. After an examination of the record we are convinced that the evidence, together with such inferences as may reasonably be drawn therefrom, amply support the findings and judgment.

On June 6, 1928, plaintiff's predecessors leased to A. D. Van Vracken certain real property in Los Angeles for a period of 99 years. The court found, and the finding is supported, that Van Vracken was acting for Birch, and that on the day the lease was executed it was assigned to Birch. The lease called for the payment of graduated rentals, which, during the years 1934, 1935 and 1936, amounted to $1,000 per month. Birch paid all rentals due under the lease until

October of 1934, when all payments ceased. By August of 1935 there was owing to plaintiff an admitted sum of $9,412.59. Plaintiff had secured several judgments against Birch for such delinquent rent totaling $6,395.70. During 1935 plaintiff had several actions pending against Birch. It was under these circumstances that in August of 1935 Birch, and a man by the name of Benson, whose connection with these transactions will be discussed later, induced plaintiff to compromise the total indebtedness of $9,412.59 for $6,000, and to agree to a modification of the lease lowering the monthly rental over a five-year period on a graduated scale, starting with $500 a month. The reduced rental was paid until May of 1936, when the lessee again became delinquent. Respondent contends that he then discovered that he had been defrauded in that he had been induced to enter into the compromise and the lease modification by false representations concerning Birch's financial status. In May of 1937 he brought the present action in fraud and deceit to recover from all three defendants $8,412.59 damages, $3,412.59 alleged to have been sustained by reason of the compromise, and $5,000 through acceptance of reduced rentals. As against A. Otis Birch alone he seeks to recover certain expenses and attorney's fees as provided in the lease. The trial court granted judgment against all three defendants for the larger sum, and against A. Otis Birch alone for $1,253.85 for attorney's and investigation expenses.

The defendants and appellants are A. Otis Birch, his wife Estelle, and his cousin Lula M. Minter. The complaint alleges that defendants falsely and fraudulently represented to plaintiff, and he was thereby led to believe that at the time the compromise and lease modification agreements were entered into Birch was in an unsafe and dangerous condition financially; that it was represented to plaintiff that Birch was indebted to defendant Minter in the sum of $25,000 represented by a note secured by a second deed of trust on certain real property owned by Birch; that it was also represented to plaintiff that Birch was also indebted to defendant Minter in the sum of $130,000 represented by a note secured by a pledge of the entire capital stock of the Birch Holding Company, which, in turn, held all the stock of the Birch Securities Company and of the Birch Ranch and Oil Company, which last two mentioned companies owned practically all of the properties in which the Birches were interested,

and that if plaintiff insisted on the payment of the rental provided for in the lease Minter would sell the pledged stock and render Birch insolvent.

The complaint also alleged that defendant Minter conspired with defendants Birch to accomplish the fraud. Plaintiff further alleged that the representations were false; that the $25,000 note and trust deed and the $130,000 indebtedness were fictitious and non-existent; that plaintiff, in belief and reliance on their genuineness, was induced to execute and perform the settlement agreement, to his damage.

The findings of the trial court followed substantially the allegations of the complaint. It is an admitted fact that the evidence supports the findings that Birch and Benson represented that Birch owed Minter a total sum of $155,000; that unless a modification were secured she would sell out the pledge and trust deed, thus stripping the Birches of substantially all of their assets; that the Birches would be forced into bankruptcy. It is a reasonable inference, and no contention is made to the contrary, that such representations were made for the purpose of inducing plaintiff to act upon them. There also can be no doubt that the evidence supports the findings that plaintiff executed the compromise and modification agreements in reliance on the truthfulness of such representations and would not have executed them otherwise. There can also be no doubt, and this is not disputed, that if the finding that the representation as to the existing indebtedness of Birch to Minter was false is supported, that plaintiff has a good cause of action for such fraud at least as against Birch. On the other hand, plaintiff admitted at the trial, and admits on this appeal, that if that finding is unsupported and the indebtedness to Minter actually existed, he has no cause of action against any of the defendants. So far as the sufficiency of the evidence is concerned, therefore, the only serious question presented for consideration is whether or not the finding that Birch was indebted to Minter is supported by the evidence.

The record shows that Birch commenced borrowing from his cousin, defendant Minter, and her relatives, many years before this controversy arose. The relationship between Birch and Minter was one of great affection and confidence. Birch had been reared by Miss Minter's parents and lived in their home until the time of his marriage. Although they were first cousins, they looked upon each other as brother and sister.

He handled nearly all of her financial dealings. Prior to the year 1900 Birch had borrowed several thousand dollars from Miss Minter's mother, and he later borrowed relatively small sums from Miss Minter and her sister, now deceased, until in 1927 he owed them about $17,000. The purpose of these loans, and their continued renewals, was not so much to accommodate Birch as it was to help the Minters find a safe place for the investment of their funds at an attractive rate of interest. After 1927 Miss Minter became possessed of large sums of money by inheritance from her parents and sister. Thereafter, the transactions between the two increased in number and amount.

Many of the transactions involved the transfer from Birch to Minter of Yolo County reclamation district bonds on a ranch owned by the Birches known as the Conaway Ranch. These bonds were part of a $2,000,000 issue, less than one-quarter of which had been sold to the public, the balance being owned by Birch. The bonds had a par value of $1,000, and bore 6% interest. Default on the bonds occurred in 1934. In 1928, and each year following up to 1934, Miss Minter purchased from Birch large numbers of these bonds aggregating $80,000, for which she paid Birch by checks on her account. Birch testified that these bonds were sold by him to Miss Minter subject to his oral promise to repurchase the bonds at par. From time to time he did repurchase some of the bonds when she needed cash. The trial judge, who had the power to pass on the credibility of the witnesses, was not bound by this testimony. He could, and apparently did, disbelieve Birch's story, and concluded from all the testimony that Miss Minter made an outright purchase of these bonds.

By 1932 Birch undoubtedly owed to Miss Minter another sum of $50,000, represented by a note secured by a mortgage.

It should be here mentioned that up to 1930 Birch was a man of considerable wealth and was engaged in many profitable enterprises. From 1926 through 1929 his net worth was over $3,000,000, and his net income over $100,000 a year. After 1930 Birch became financially involved and his assets began to shrink in value, although at no time did his status approach that of insolvency. It is clear that after 1930 the sums borrowed by him from Miss Minter were desired by him to assist him in his financial difficulties.

Giving the evidence the strongest possible interpretation in favor of appellants, and disregarding the possible and rea-

sonable conclusion that the $80,000 did not in fact represent a debt owed by Birch to Minter, it can be assumed, for the purposes of this opinion, that in 1932 he owed Minter $130,-000, $80,000 of which was secured by the reclamation bonds, and $50,000 by a mortgage. Commencing in that year occurred a series of transactions upon which respondent relies as supporting the trial court's conclusions that this debt was paid in full, and that thereafter it was fictitiously kept alive for the purpose of defrauding, among others, the plaintiff.

In 1932 and 1933 Birch transferred to Miss Minter stock of five different companies. He transferred to her 90% of the stock of the Birch-Smith Storage Company. Birch and Minter testified that this stock was valueless, but Smith, an officer of the company and a witness for defendants, testified that its value at the time of transfer was $75,000, less an $8,543.32 loss. In view of this evidence it must be assumed, in support of the judgment, that 90% of this stock transferred by Birch to Minter was then worth about $60,000. In 1935 Birch testified in a supplementary proceeding in which plaintiff was attempting to collect his judgments that Miss Minter ''purchased'' this stock from him. While testifying in the instant case he stated that what he meant was that ''she was entitled to that stock and possibly much more, because of many loans that she had made times when I was badly in need of them. She had loaned me money just before I gave her the stock. She actually paid nothing for it.'' Admittedly, the only loans made by Miss Minter at this time were part of the $130,000 above-mentioned. What does the testimony above-quoted mean? Is it an admission that the stock was turned over in partial payment of the debts then existing? That is a reasonable interpretation of the testimony.

Also during 1932 and 1933 he transferred to Miss Minter over 600 shares of Lyon Storage Company stock, 400 shares of Pacific Crest Cemetery stock, an unfixed number of shares of Citizen's National Bank stock and 40 shares of Western State Life Insurance Company stock. Birch testified that the value of these shares at the time of the transfer was between $60,000 and $100,000, and that such stock was absolutely clear when transferred. In explanation of these transactions, although he had failed to mention these transfers on former hearings, Birch testified that this stock was transferred in return for a promise of Miss Minter to will her home place

to him. He further testified that Miss Minter did make a will devising the home place to him. Plaintiff's witnesses fixed the value of the home place in 1933 at $16,000.

Thus, during this period at a time when he claims to have owed Miss Minter $130,000, he transferred to her assets which, taking their highest values as fixed by the evidence, were worth $160,000 or more. It should also be mentioned that in 1933 Birch prepared a detailed financial statement in which he did not list the $80,000 claimed to be owing to Miss Minter as a liability.

If the trial judge had believed the testimony of Birch and Minter he could have found that these transfers were either gifts from Birch to Minter, or were in return for the promise to will the home place to him. But the court was not bound to so find. The trial court could, and did, disbelieve the testimony of these two witnesses. It is a reasonable inference that if the indebtedness existed it was canceled by these transfers. The trial judge saw the witnesses. He knew of the many contradictions in Birch's testimony. He was in a much better position than this court to pass upon the credibility of the witnesses. He found that no indebtedness in fact existed. He was not bound to believe the explanation proffered by Birch. He knew that these parties had been dealing together for many years with no evidence of large gifts passing between them. He knew that after the 1932-1933 transactions the parties again entered into many transactions. He knew that Birch was heavily involved in 1932 and 1933. He knew of the close relationship existing between the parties. Under such circumstances, the trial court was entitled to infer that Birch in fact was attempting to protect Miss Minter, and, to do so, transferred to her these assets in payment of the existing obligations. This inference is more than a mere suspicion —it is predicated upon the evidence and is based on reasonable probabilities.

After the transactions of 1932-1933, above-described, Birch and Miss Minter went through the motions of purporting to keep the indebtedness alive. In October of 1934, the same month he first failed to pay rent on the Campbell lease, Mr. and Mrs. Birch formed three Birch corporations, in one of which they vested their ownership of the reclamation bonds and other securities, and to another they transferred most of their other assets valued at many hundreds of thousands of dollars. The third corporation was a holding company, pos-

sessed of the stock of the other two, its stock of 100,000 shares being owned 51% by Mrs. Birch and 49% by Mr. Birch. Birch then purported to have had an accounting with Miss Minter in which he recognized the existence of a $130,000 indebtedness to her. He then had Miss Minter transfer back to one of his companies the reclamation bonds valued at $80,000 and to release the $50,000 mortgage. He and his wife then gave Miss Minter their promissory note for $130,000 secured by a pledge of the 100,000 shares of holding company stock. This stock was worth many times the amount of the note.

In November of 1934 the Birches gave Miss Minter a second deed of trust on certain real property referred to as the Broadway property, as security for a loan of $15,000 and future advancements. On May 1, 1935, Miss Minter advanced another $10,000 under this agreement. It is to be noted that this $25,000, when added to the $130,000 above mentioned, makes a total of $155,000 allegedly then owed to Miss Minter. That is almost the exact value of the stock transferred to Miss Minter by Birch in 1932 and 1933. The trial court found that the $25,000 indebtedness, as well as the $130,000 indebtedness, was fictitious. The basis for these findings has already been discussed. Although the $25,000 undoubtedly passed from Miss Minter to Birch, the trial court could, and did, infer it was merely balancing the transfers of 1932 and 1933. It was this purported indebtedness that was used by Birch as a basis for the representations made to Campbell concerning Birch's uncertain financial status. It was these representations upon which Campbell relied in entering into the compromise and lease modification agreements of August, 1935.

There is one other matter to which reference should be made. During the first part of 1935 Birch and a man by the name of Benson had offices in the same suite. Benson was assisting Birch in attempting to refinance some of his obligations, including the obligations on the lease and judgments owed to Campbell. The plaintiff testified that he first talked directly with Mr. Birch in March or April of 1935 concerning the proposed settlement. In that first conversation Birch, according to Campbell, made most of the representations forming the basis of this action. On at least one occasion Campbell talked with Mrs. Birch, and she told him that they were anxious to settle the dispute. The balance of the negotiations were carried on by Benson. Birch contends that

there is no evidence that Benson was his agent, and so testified on this trial. In prior proceedings he had freely admitted that Benson had negotiated the settlement for him. No useful purpose would be served by discussing the evidence on this point in detail. Suffice it to say that it is a reasonable inference from the evidence as a whole that Benson acted in this transaction as the agent of Birch. Benson represented that Miss Minter was angry at Birch and would foreclose him out of the entire Birch Holding Company stock if the Campbell dispute was not settled, and would force Birch into insolvency. Birch likewise represented to Campbell that he was faced with insolvency. These representations were palpably false. The record demonstrates that at all times Miss Minter and Birch were on the friendliest terms, and that she did whatever he told her to in reference to these various transactions. Although Birch was heavily involved, the record demonstrates that at no time did his status even approximate that of insolvency.

The deal between Benson and Birch was consummated on July 16, 1935. By that agreement the Birches transferred to Benson most, but not all, of their valuable assets, including the 100,000 shares of holding company stock. Benson agreed to discharge the liabilities against the properties transferred, and further agreed that when the holding company stock reached a net market value of at least $1,000,000 he would pay the Birches $500,000 cash. Coincidentally, Miss Minter canceled the various notes of the Birches purporting to represent the various debts owed to her by them, and accepted in lieu thereof the note of Benson for $162,574.66, payable ten years after date, to be secured by the holding company stock.

It was under these circumstances that in the middle of August, 1935, the compromise and lease modification agreements were entered into, with Benson handling the details for the Birches. At the request of Benson and with the approval of the Birches, the compromise was not handled in the normal way by entering a satisfaction of the existing judgments, but such judgments were assigned to Benson. The record shows that Benson then used the Campbell judgments to foreclose on the various equities retained by Birch in the few properties not already transferred to him in the July transactions. While the Benson-Birch agreement was still in effect Campbell brought an action against them to set it aside

as in fraud of creditors. The record shows that this action was settled by Birch paying Campbell the sum of $12,000, the amount of his claims on the date of the trial. For reasons that are not entirely clear, the Benson-Birch agreement was terminated in November, 1937, and all the properties turned over to Benson under the agreement were returned to Birch, and, in addition, the properties secured by Benson by executions under the assigned Campbell judgments still retained by Benson, were returned to Birch. The Benson note to Miss Minter was canceled and the Birches executed a $172,000 note in her favor secured by a pledge of a trustee's certificate representing the holding company stock.

From this evidence the trial court could, and apparently did, conclude:

1. That the representations that Birch was facing bankruptcy and would be forced into bankruptcy if the Campbell dispute was not settled, and that Miss Minter was intending to foreclose against Birch were false. It is quite clear that by reason of the confidential relationship existing between Birch and Miss Minter, and their affection for each other, she would never have threatened him with foreclosure, nor would she have proceeded against him. The only reasonable inference from the evidence is that she knowingly permitted her name to be used by Birch to promote his enterprises and to protect his investments.

2. That the reclamation bond transactions were outright sales and not loans, and that $80,000 of the indebtedness did not exist. It must be remembered that Birch failed to list this alleged liability in his financial statement of 1933.

3. That even if this indebtedness did exist, it is a reasonable inference that it, as well as the $50,000 indebtedness, was canceled by the transfers made to Miss Minter by Birch in 1932 and 1933.

4. That such indebtedness was fictitiously kept alive for the purpose of defrauding, among others, the plaintiff.

5. That Miss Minter and Mrs. Birch knew what Mr. Birch was doing, and knowingly permitted their names to be used in the attempt to defraud Campbell by creating the false impression that substantially all the assets of the Birches were pledged to Miss Minter as security for debts which in fact did not exist.

Under these circumstances, the findings that the three appellants conspired to defraud, and did defraud Campbell,

to his damage are amply supported. It is true that there is no evidence that Miss Minter made any false representations, that there is no direct evidence that she knew what Birch was doing, and that she and Birch testified the alleged debts actually existed. But, of course, the trial court was not required to believe their testimony. The trial court is the exclusive judge of the weight of the evidence and the credibility of the witnesses. It is its province to give to the evidence that weight to which, in its judgment, it is entitled, and to draw all reasonable inferences therefrom, and if, in its judgment, the evidence is entitled to no weight it may disregard such evidence altogether. (24 Cal. Jur. 886, sec. 135.) The cases have frequently taken notice of the fact that it is next to impossible to secure direct evidence of a conspiracy, unless one of the participants has confessed, and that the proof must usually be inferential and circumstantial. Thus, in *Johnstone* v. *Morris*, 210 Cal. 580, 590 [292 Pac. 970], it is stated: "In cases of conspiracy to defraud it is not to be expected that direct evidence of the conspiracy can be secured, because such evidence could usually only be secured in the event one of the conspirators confessed. The jury may infer the conspiracy from all the circumstances, and if the inference is a reasonable one it will not be disturbed on appeal. These principles have repeatedly been recognized by this court. In *Revert* v. *Hesse*, 184 Cal. 295, at 301 [193 Pac. 943, 946], this court, quoting from a Georgia case, said:

" ' "The law recognizes the intrinsic difficulty of proving a conspiracy. The allegations with reference to conspiracy are treated as matters of inducement leading up to a more particular description of the acts from which conspiracy may be inferred. . . . The conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances. . . ." ' '

"On the same page (301) the court continued as follows: " 'In the present action, while plaintiff was unable to prove any formal agreement between defendants Arthur Hesse and Sidney Beach, nevertheless, there was before the court the entire transaction resulting in the consummation of a flagrant fraud upon the plaintiff, in which transaction Sidney Beach participated as an intermediary. . . . These circumstances, coupled with the further fact that defendants Sidney Beach and Arthur Hesse were not strangers, but were on

more or less intimate terms, occupying the same office, were sufficient to warrant the inference drawn by the trial court that defendant Sidney Beach was a party to a conspiracy which had for its object the fraudulent conversion complained of by plaintiff.' ''

''In *Beeman* v. *Richardson*, 185 Cal. 280, at page 282 [196 Pac. 774, 775], the rule is stated as follows:

'' 'The point in connection with the finding as to a conspiracy is that the representations were made by the defendant, Richardson, alone, and that there is no direct evidence that the other defendants agreed that they should be made, or knew at the time that they were being made. But direct evidence of that character could hardly be had in the very nature of things, unless one of the defendants should confess, and the fact must be determined by the inference naturally and properly to be drawn from those matters which can be, and are directly proven.' ''

If the inference that Birch paid all his obligations to Miss Minter is supported, and we think it is, then obviously Miss Minter knew that fact. With such knowledge, to have entered into the transactions above-described, makes her liable as a joint participant. The above reasoning likewise applies to Mrs. Birch. On this part of the case we conclude our discussion with the holding that under the evidence the inference of joint fraud was not unreasonable, and for that reason will not be disturbed on appeal.

Appellants next contend that there is no evidence of damage, or, in the alternative, that the trial court applied the wrong measure of damages. These contentions are based on the theory that respondent did not elect to rescind by first returning what he had received, but instead elected to stand on the contract and sue for the damage suffered. If respondent had rescinded, the measure of damages, so far as general damages are concerned, would have been the full amount of the debt owed by Birch to Campbell, and the full amount due on the lease. But, it is urged, when a defrauded plaintiff elects to stand on the contract and sue for damages, the measure of damages is different. It is urged that in such event proof must be made that the claims which were relinquished as a result of the fraud, were in fact collectible, and that, in this case, no such evidence was introduced, and no such finding made.

These contentions are unsound. They are given color only

because of language used in certain cases where the factual and legal situation was entirely different from that involved in the instant case.

█ Running through appellants' argument on this point is the implication that there is something questionable about a defrauded plaintiff electing to sue for damages, rather than rescinding. There can be no doubt of the propriety of such procedure. In *Bozarth* v. *Birch,* 52 Cal. App. 55 [198 Pac. 222], in a case where the alleged fraud was strikingly similar to the one involved in the instant case, this same appellant urged that the sole remedy under such circumstances was to rescind, and cited *Bancroft* v. *Bancroft,* 110 Cal. 374 [42 Pac. 896], one of the cases relied upon in the present case. The court held that where a contract is secured by undue influence, the proper remedy of the injured party is to rescind, but where the defendant secures an advantageous contract by fraudulent representations, the injured party may elect to affirm the contract and sue for the fraud. The same rule was announced in *Westerfeld* v. *New York Life Ins. Co.,* 129 Cal. 68 [58 Pac. 92, 61 Pac. 667], the main case relied on by appellants. See, also, 12 Cal. Jur. 781, section 49, where the many authorities establishing the rule are collected and commented upon.

█ In support of their contention that before damages may be recovered in such an action there must be proof and a finding that the compromised or modified claim was in fact collectible, appellants place their main reliance on the Westerfeld case, *supra.* In that case the insurance company had issued a $10,000 life policy to Westerfeld containing a provision that at the expiration of five years the insured might surrender the policy and receive the then cash value. The complaint filed by the executors of Westerfeld's estate alleged that after four annual premiums had been paid an arrangement was entered into whereby a new policy was issued in place of the old one, and that it was agreed that the cash value of the old policy would be computed and applied to the fifth premium on the first policy, the surplus to be applied to future premiums on the second policy. Westerfeld died with both policies in his possession and, at the time of death, had received no notice of the cash surrender value of the first policy, which was sufficient to pay the fifth premium on the first policy and the first premium on the second. The executors demanded payment of the second policy. The theory was that the defendant was alleged to have made fraudulent

statements to the executors to the effect that the second policy was never in force and that the first policy had become void by failure of Westerfeld to pay the fifth premium, and that, based on these fraudulent representations, the executors had entered into a compromise under which both policies were surrendered upon payment of $2,666.66.

The defendant admitted making the representations but contended that they were true. They urged that it was a fact that the second policy never became effective and that the first one had lapsed. No rescission was had. The trial court instructed the jury that the measure of damages was the difference between the compromise payment and the face of the policy. In reversing the decision the court held that in such event, where the existence of the compromised claim is in dispute, if an action for fraud as distinguished from rescission may be maintained, which was doubted, it is incumbent upon the plaintiff in proving damages, to show that the compromised claim was in fact collectible.

It is obvious that the rule of the Westerfeld case only applies where the compromised claim is disputed, either as to its existence or as to its amount. Not only does the case expressly so hold, but in *Taylor* v. *Hopper*, 207 Cal. 102 [276 Pac. 990], the case was so interpreted. In that case it was stated (page 105):

"The case of *Westerfeld* v. *New York Life Ins. Co.*, 129 Cal. 68 [58 Pac. 92, 61 Pac. 667], relied upon by appellant, is not helpful to her cause for that case holds that for the plaintiff to maintain such an action as we are here considering, the compromise sought to be avoided must have been of an undisputed claim. In the decision of the court commissioner, adopted by the court, it was said: 'Cases of that nature (where one who seeks to rescind a compromise agreement on the ground of fraud is not required to restore the money he has received) arise when a party has been led by fraudulent contrivance to accept less money than was due him on an *undisputed* claim, as in *Gilson etc. Co.* v. *Gilson*, 47 Cal. 597.' The compromise made in the case before us was of a disputed claim, unliquidated in amount and there is no practicable measure of damages for the action sought to be maintained. The demurrer, therefore, was properly sustained without leave to amend."

In the case at bar the claims compromised were not disputed either as to amount, or as to their existence. Over

$6,000 of the compromised amount had been reduced to judgment. The balance was of sums admittedly due under the lease. So far as the modification of the lease is concerned, it was conceded that the obligation was fixed and certain. The amount compromised was definite and undisputed. Obviously, this case is of the type that falls directly within the exception to the rule announced in the Westerfeld case, *supra,* and quoted in the Taylor case. In effect, the cause of action is one where the damage suffered by the defrauded party is fixed and certain—just as fixed and certain as if the defrauded party had technically rescinded. Obviously, if no compromise had been made, plaintiff would have been entitled to a judgment or judgments for the unpaid rent. The judgment in the present case is exactly in the amount the plaintiff would have been entitled to if no compromise, induced by defendants' fraud, had been negotiated. What other measure of damages would compensate the defrauded party under such circumstances? The only way the defrauded party can be made whole is to return to him the amount to which he admittedly would be entitled had the fraudulent compromise not been secured. To urge that the defrauded party must show that the undisputed liability was in fact collectible in the sense that the defendants were financially responsible is to bring in a false issue. Courts in rendering judgments are not interested in whether the plaintiff can collect the same—they are concerned with the amount of the damage suffered. The collectibility of the compromised judgments and claims, and the collectibility of the present judgment, are matters which are entirely beyond the issues in this case. When the plaintiff proved the claims were fixed, definite and admitted as to their existence and amount he proved they were ''collectible'' as that term is used in such cases. Where the claim forming the basis of the compromise is fixed and certain, and where the plaintiff under any theory is entitled to keep the amount paid on the compromise, the measure of damages, so far as general damages are concerned, is *prima facie* the difference between the amount paid on the compromise and the face amount of the fixed and certain claim.

Appellants also urge that certain alleged rights obtained in the compromise by respondent were not taken into consideration in determining the damages. Thus it is urged that Mrs. Birch guaranteed the reduced rental due under the lease as modified for five years, and it is urged that the trial

court should have considered the value of this guarantee in fixing the damages. Appellants also urge that under the modified lease an option to purchase was canceled, and that the value of such cancellation should have been fixed. The obvious answer to these points is that the respondent pleaded and proved his damage in the form required by law. If appellants believed the matters above-discussed had any value, that was a matter of defense which should have been pleaded and proved by them. No issue was made in the trial court on these points and it is too late to raise them for the first time on appeal.

Appellant A. Otis Birch complains of that portion of the judgment which allows respondent as against this appellant $375 for investigation expense and $878.85 by way of attorney's fees. These amounts were allowed against this defendant under a provision of the original lease, which remained unchanged by the modification, and which reads as follows:

"It is hereby agreed between the parties hereto that Lessee shall pay all reasonable costs, expenses and attorney's fees incurred by or against Lessors in any litigation between the parties hereto or persons claiming under them, arising out of or in connection with this lease or the construction or enforcement thereof, in case the Lessors or parties claiming under them shall prove successful in such litigation. . . ."

The judgment against all three defendants is in the total amount of $8,413.59. According to the findings, $5,000 of this amount is for the difference between the reduced rentals and the amount called for in the lease. The balance was for the difference due under the lease and the amount of the compromise. All claims forming the basis of the judgment "arose out of and in connection with the lease" as provided in the lease agreement. It was therefore proper for this allowance to be made.

For the foregoing reasons the judgment appealed from should be, and hereby is, affirmed.

Gibson, C. J., Edmonds, J., and Traynor, J., concurred.

CARTER, J., dissenting.—I dissent.

I am unable to agree with either the conclusion reached in the majority opinion or the reasoning upon which it is based. As the conclusion reached therein is based upon inferences drawn from certain facts, I will first state the facts as disclosed by the record.

It appears that for some time prior to August 1, 1935, defendant A. Otis Birch had been a tenant of certain real property under a 99-year lease dated June 6, 1928, which had been assigned to him immediately following its execution. The rental payable under said lease was $1,000 per month. Said defendant had failed to pay such rental for the period from October, 1934, to April, 1935, and plaintiff had recovered judgments against him therefor in the sum of $6,395.70. Defendant had also failed to pay the rental due under said lease for the months of May, June and July, 1935, and plaintiff had demanded of said defendant the sum of $3,016.89 in payment thereof.

On August 20, 1935, after considerable negotiating between the parties, plaintiff entered into an agreement with defendants A. Otis Birch and M. Estelle C. Birch, his wife, dated August 1, 1935, whereby the indebtedness of said defendant A. Otis Birch amounting to $9,412.59 was settled for the sum of $6,000, and it was further provided that the rental under said lease be reduced for the ensuing five years on a graduated scale. Commencing August 1, 1935, the rental was reduced from $1,000 to $500 per month. This agreement was performed by defendant and he thereafter paid plaintiff the reduced rental agreed upon for the period commencing August 1, 1935, to May 1, 1936.

Plaintiff thereupon commenced this action alleging that defendants A. Otis Birch and M. Estelle C. Birch, who are husband and wife, induced plaintiff to execute the settlement agreement by means of false and fraudulent representations as to the financial condition of said defendant A. Otis Birch. Lula M. Minter was joined as a defendant on the ground that she participated in the conspiracy to defraud complained of by plaintiff.

The complaint alleges that defendants falsely and fraudulently represented to plaintiff and he was thereby led to believe that at the time said agreement was executed and for some time prior thereto defendant A. Otis Birch was in an unsafe and dangerous condition financially; that he was indebted to defendant Minter in the sum of $25,000 represented by a note secured by a trust deed on certain real property owned by defendant A. Otis Birch; that he was also indebted to defendant Minter in the sum of $130,000 secured by a pledge of 100,000 shares of stock, being the entire capital stock of the Birch Holding Company, which in turn held

all of the stock of the Birch Securities Company and Birch Ranch and Oil Company, which two last-mentioned companies owned practically all of the properties in which the Birches were interested, and that if plaintiff insisted on the payment of the rental provided for in said lease, Minter would sell said stock under the pledge and render Birch insolvent. The complaint further alleged that defendant Minter conspired with defendant Birches to accomplish such fraud. Plaintiff also claimed as against defendant A. Otis Birch the sum of $531.90 as expenses incurred in preparing proof for the action, and also attorney's fees by reason of a clause in the lease providing for the same in any action in connection with the lease. Plaintiff further alleged that the representations were false; that the note, trust deed and indebtedness to defendant Minter were fictitious and nonexistent; that plaintiff in belief and reliance on their genuineness was induced to execute and perform the settlement agreement, and that he was damaged thereby in the sum of $3,413.19 by reason of the settlement of the judgment and the sum of $5,000 by reason of the receipt of less rent for the period of ten months under the lease as modified.

*During the course of the trial plaintiff's counsel conceded that if the indebtedness from Birch to Minter actually existed, plaintiff could not prevail in this action.*

The findings of the trial court followed substantially the allegations of the complaint, and judgment was entered for plaintiff against all of the defendants for $8,413.59, and against defendant A. Otis Birch individually for $375 expenses preparing for trial and $878.85 attorney's fees.

Defendants' main contention in support of their appeal from the judgment rendered against them is the insufficiency of the evidence to support the findings of the trial court upon which the judgment is based.

The evidence produced by plaintiff as to the misrepresentations alleged to have been made by defendants was as follows: Plaintiff testified that in 1933 defendant, A. Otis Birch, furnished him with a financial statement showing various assets and liabilities; that during the period from March to July, 1935, at a time when said defendant was in default under the lease and had not paid the judgments for rent, two supplementary proceedings were conducted by plaintiff in aid of the enforcement of the judgments against said defendant; that during such proceedings and also in conversations be-

tween defendant, A. Otis Birch, and plaintiff, the former stated, that "his financial condition was such that he did not have funds available to pay the rent and that he would have to have a modification; that he simply could not go on. That he owed lots of money and he told me the different amounts that he owed;" that he owed defendant Minter $130,000 on a note and that she held the stock (100,000 shares) of the Birch Holding Company "and that he owed her $25,000 on a second mortgage on the Broadway property;" that "he was living by borrowing from his relatives; he was practically broke. The only available funds he had were those borrowed from his relatives;" that unless "he did get relief he would have to go into insolvency, or bankruptcy, *or something.*" That he had "nothing that was tangible, that you could collect anything on, and everything seemed to be mortgaged to the limit." Plaintiff stated that a certain Stanley C. Benson, whom he claimed was Birch's agent, (the consummation of the negotiations culminating in the execution of the settlement agreement on August 20, 1935, were carried on between Benson and plaintiff) had stated to him during the same period that he (Benson) personally knew that the Minter obligations existed, and that he could get Minter to "not close out" Birch if the lease could be modified. Plaintiff further testified that defendant, M. Estelle Birch, stated to him that "they (the Birches) were in bad financial condition," and that she gave him the "impression" that they "were practically broke, insolvent"—she did not say it in those words, but would give you that "impression." With respect to factors upon which plaintiff relied in executing the settlement agreement he testified:

*"I believed . . . that Mr. Birch on August 1st really owed Miss Minter $130,000.00 on the property, which was what I considered the fact . . . and I believed that all I could do would be to attach the stock in order to collect any money, and that Miss Minter would come in with a $130,000.00 mortgage and take it away from me, because I could not pay off that large of a loan, as well as relying upon the fact that Mr. Birch had said unless he did get relief he would have to go into insolvency, or bankruptcy, or something."*

In regard to the basis for this action, plaintiff testified:

"Q. And one of the reasons you filed it (the action) was because you felt she (Minter) *did not have enough money to*

*loan Mr. Birch approximately a hundred twenty-five or a hundred fifty thousand dollars?* A. $155,000. Q. You also said, I believe, that when the representation was made to you that Mr. Birch had given his note, secured by stock, to Miss Minter for $130,000.00 and the additional $25,000.00 was loaned, when the representation was made to you you believed it? A. Yes. Q. And you relied upon it in making this adjustment? A. Yes. Q. And then subsequently you made up your mind that that was untrue? A. That is right. Q. Now, if you had ascertained that the $130,000.00 and the $25,000.00 had actually been loaned, then you would not have brought this suit would you? A. Why, no.''

It follows therefore that the representations upon which plaintiff must rely to support the judgment are those concerning the indebtedness to Minter and the pledge of stock and trust deed securing it. The evidence establishes that such representations were made and that plaintiff relied thereon and was thereby induced to execute the settlement agreement. It may be inferred from the circumstances that they were made by Birch for the purpose of inducing plaintiff to act upon them.

It is, however, necessary in order for plaintiff to make out a case, to prove that those representations were false. Defendants assert that plaintiff not only failed to prove the falsity of the representations complained of but that the evidence establishing the truth thereof stands uncontradicted. In order to have a clear understanding of the facts relating to the transactions between the Birches and Miss Minter it is necessary to review the history of these transactions. According to the evidence, A. Otis Birch commenced borrowing money from his cousin, defendant Minter, and her relatives many years before this controversy arose. Various transactions were had between them in which sums were borrowed and partly repaid, including the sale by Birch to Minter of bonds in a reclamation district which Birch agreed to repurchase from her at face value. There were periodic settlements between them of their accounts. During that time and up to 1930, Birch had assets amounting to several million dollars in value. In an adjustment between them in about October, 1934, various obligations were aggregated and adjusted, the upshot being that Birch gave Minter his note for $130,000 and pledged to her as security 100,000 shares of stock of the

Birch Holding Company, the same being the entire issue of that company. Plaintiff did not controvert the evidence of such balance as being a genuine indebtedness. I will not attempt to discuss the many transactions leading up to that adjustment; however, from an examination of the evidence I am compelled to conclude that not only did plaintiff fail to sustain the burden of proving that the indebtedness did not exist in 1934 when the adjustment was made, but defendants' evidence sufficiently establishes that it did exist. At about that time Birch caused to be organized three corporations, the Birch Ranch and Oil Company, Birch Securities Company, and Birch Holding Company. He transferred the bulk of his property and holdings to the first two corporations the stock of which was taken by the last-mentioned corporation. The stock of the Birch Holding Company was issued to Mr. and Mrs. Birch, 49% and 51% respectively. A note was given by defendants Birch to Miss Minter on November 8, 1934, for $15,000, secured by a second trust deed on certain property known as the Broadway property which was not included in the transfer to Birch Holding Company. The trust deed provided that it was also to stand as security for future advances. (This note and trust deed are the ones claimed to be fictitious and executed for the purpose of defrauding plaintiff.) There was a first trust deed held by a bank against the property for some $25,000. Defendant A. Otis Birch testified that he received $15,000 upon the execution of the note and trust deed and that an additional $10,000 was advanced by Minter to Birch under the trust deed on or about May 1, 1935. Defendant Birch also testified that in 1932 he transferred to Minter stock in Lyon Storage Company and several other corporations, of the value of from $60,000 to $100,000 in return for her promise to devise to him by will certain real property owned by her; *that in accordance with her promise she devised the property to him;* and that in 1933 he transferred to her 90% of the stock in the Birch-Smith Storage Company. He also stated that he gave or sold the stock to her. The evidence is conflicting as to the value of the stock, Minter and Birch stating that it was practically without value, and Smith, an officer of the company, testifying that its value in 1933 was $75,000 less an $8,543.32 loss. On July 16, 1935, Benson and defendants Birch entered into an agreement wherein it was recited that said defendants had many finan-

cial difficulties, and had transferred most of their assets to the three Birch corporations heretofore-mentioned, and the corporations assumed some of Birch's liabilities; that the Birches were endeavoring to refinance their and the corporations' obligations; that Benson had purchased some of Birches' property at execution sale. It was then agreed that Benson would obtain for Birches a release of all liability to Minter for the $130,000 and $25,000 indebtedness, and assume and agree to pay the same to Minter; that the stock in the Birch Holding Company was to be transferred to Benson, subject to indebtedness owed to Minter and $76,000 to Mrs. Conaway and to future loans from Minter, not exceeding $200,000 and from Conaway not exceeding $150,000; that the directors and officers of the three Birch Companies were to resign and be replaced by persons of Benson's choice; that Benson was to pay all the debts of the Birch Corporations and some specified personal debts of the Birches; that all refinancing necessary to pay such debts must be so done that the Birches would have no personal liability; that the Birches were to receive sufficient for living expenses; that the market value of the stock of the Birch Holding Company is $1,000,000, and that if and when the corporations' liabilities are refinanced, Benson was to pay Birches $500,000; Birch was to manage the corporations' property subject to the direction of the boards of directors. Pursuant to that agreement Minter released Birches from the $130,000 and $25,000 obligations and accepted in lieu thereof Benson's note, to be secured by a pledge of the stock of Birch Holding Company, and with an agreement that such security could be used for $200,000 additional future loans from Minter to Birches; a voting trust agreement was made between Benson and Birches with reference to the Birch Holding Company stock, under which Birches held the stock as trustee with voting authority and with Benson as beneficiary, and providing that the stock was to be deposited with the trustee, the Birches to issue a trustee's receipt to Benson. The receipt was issued but not endorsed to Minter, and it is not clear whether she received it or not. She testified that as the result of the Benson-Birch agreement of July 16, 1935, she received the stock of the Birch Holding Company issued in Benson's name as security for Benson's note. The Benson-Birch arrangement was discarded in 1937. Benson gave Minter his note for approximately $162,000, the same represent-

ing the $130,000 and $25,000 obligations and interest thereon. When the Benson-Birch arrangement was discarded the Birchs gave their note for about $172,000 to Minter.

It is plaintiff's position that several inferences may arise from the various transactions engaged in by the Birchs and the foregoing events which support the judgment. Among others he refers to the Benson-Birch agreement in which it was recited: "You know we had many financial difficulties; that we formed three corporations last October (the Birch Companies)—for reasons with which you are familiar; that we transferred certain assets to these corporations subject to the assumption by them of certain liabilities; that we retained considerable real estate, and we have been making strenuous efforts to refinance all of our obligations. You yesterday purchased at an execution sale three parcels of real estate formerly owned by us." This is followed by provisions to the effect that in the refinancing plan the personal liability of the Birchs is not to be incurred. Plaintiff asserts that from that agreement the inference follows that the three Birch Corporations were formed and the stock of the Birch Holding Company pledged to Minter to avoid liability and defraud creditors. In my opinion that inference does not follow. The personal liability referred to was that which might occur while Benson was endeavoring to refinance Birch's liabilities and adjust his financial difficulties. It was personal liability in the future not the past which was referred to in the agreement. One of the main lawful reasons for incorporating a business is to avoid the risk of personal liability. Therefore it cannot be said that the formation of the corporations supports plaintiff's case. That was entirely legitimate. *In any event it must not be lost sight of that the action here is for damages for alleged fraudulent representations,* to wit: that the Birches were indebted to Minter. *No issue is presented by the pleadings regarding the use of the corporate entities for fraudulent purposes.*

Plaintiff reasons that because there was no endorsement as security for the Benson note to Minter of the trustees' certificate (representing stock in the Birch Holding Company) which arose out of the Benson-Birch agreement of July 16, 1935, and no evidence of its transfer to Minter except her evidence that the stock was delivered to her after July 16, 1935, issued in Benson's name, the court was justified in

inferring that there was no pledge of the stock of that company to her in October, 1934, for an indebtedness in the sum of $130,000. No such inference reasonably follows. The matters are not necessarily related to each other. The Benson-Birch agreement of July 16, 1935, provided for the payment of the Birch indebtedness to Minter by Benson, and that the stock was to remain as security therefor. It is clear from what has heretofore been said that from the transactions between Benson and the Birches, Minter was still protected in her security for her obligation originally owed by the Birches to her. There was no change in the essential situation insofar as plaintiff was concerned by reason of the Benson-Birch transaction; there was no such change in Birch's financial position between the time Birch stated to plaintiff that he was indebted to Minter and the time the plaintiff-Birch settlement agreement was executed about August 20, 1935, which would be beneficial to plaintiff. It is true that in that transaction (Benson-Birch) Minter released the Birches on their obligations but the property of the Birches still remained liable therefor under the Benson-Birch agreement.

Plaintiff urges and the majority opinion agrees that from the foregoing transactions it may be inferred that defendants were engaged in a scheme whereby they could reduce their liabilities, reduce their obligations under the lease in which plaintiff was the lessor, and put their property out of the reach of their creditors. From the entire record I cannot agree that such an inference reasonably follows. Rather, the plain purpose seems to have been an honest endeavor on the part of the Birches to alleviate a serious financial involvement to the ultimate benefit of both themselves and their creditors. But even if such an inference may be drawn, it is not sufficient to support the judgment because *this is not an action to set aside conveyances as having been made with the intent to defraud creditors.* As we have seen, it is an action for damages for fraudulent representations; the gist of such representations are that the Birches were indebteded to Minter in the total sum of $155,000 and that the same was secured by liens on real property and corporation stock. It does not follow from a general scheme to reduce their liabilities that the indebtedness to Minter was fictitious or false.

With respect to the falsity of the representations concerning the indebtedness to Minter there is evidence heretofore-

mentioned with reference to two transactions: First, that in 1933, Birch transferred to her 90% of the stock in the Birch-Smith Storage Company, and indicated that the value of the assets of that company were about $66,456.68. In regard to that transfer Birch testified: "Q. How did she (Minter) acquire that stock? A. She bought—loaned me some other money and I gave her the stock. Q. When did you give her the stock? A. That is to say, *she purchased the stock of us. Q. When did you receive the money?* A. *Oh, about the time that the company was organized.*" Second, in 1932, Birch transferred to Minter stock in the Lyon Storage Company, Pacific Crest Cemetery, and Citizens National Trust & Savings Bank; that stock had a value of from $60,000 to $100,000. According to Birch's testimony it was made in return for Minter's promise to devise her home place to him by will; she did so devise it. Plaintiff urges, and the majority opinion is based upon the proposition that these transactions constituted a payment by Birch to Minter of his indebtedness; that from the transfer of that stock an inference arises that such transfer was in payment of the debt and that therefore the debt did not exist. I do not believe that position is tenable. As seen, the evidence is uncontradicted that a portion of the stock was transferred in return for Minter's promise to devise property to Birch. Whether that transaction was particularly advantageous to Minter is of no significance. Birch could have made a gift of the stock and plaintiff would have been in no position to complain. As I have stated before, plaintiff is not seeking to have the transfer set aside as in fraud of creditors. There is no law that prevents a debtor from giving one creditor a preference over others; indeed, the rule is to the contrary. (Civil Code, sec. 3432; 12 Cal. Jur. 1009, et seq.)

In regard to the transfer of the securities being made in consideration of Minter's promise to devise her property to Birch, we have the uncontradicted evidence that said transfer was *not made in payment of the debt;* that it was a sale to Minter for which she paid the purchase price. In order to escape the effect of that evidence, the majority decision relies upon two propositions: first, that the trial court could have disbelieved defendants' evidence on the subject; and second, that an inference of payment arose from the transfer of the securities. With the first I agree, but where does that leave us?

It must be remembered that the *burden of proof was upon the plaintiff* to establish that the indebtedness which Birch claimed to owe Minter was fictitious. But the majority opinion, in order to support its conclusion, declares that there is an inference of payment of such indebtedness by the transfer of the securities above-mentioned, and that the judgment is thereby supported. That premise must fail because there is no such inference. On the contrary the presumption commonly invoked between creditor and debtor, is that when the debtor retains possession of the instrument representing the obligation, it is concluded that the debt has not been paid. (*Light* v. *Stevens,* 159 Cal. 288 [113 Pac. 659] ; *Levey* v. *Henderson,* 177 Cal. 21 [169 Pac. 673].) And where payments are made by the debtor to the creditor, but the latter retains possession of the instrument representing the obligation, it is presumed, in the absence of evidence to the contrary, that the payment was made on some obligation other than the one involved in the action. (*Light* v. *Stevens, supra.*) In the case at bar, the notes representing the indebtedness were in Minter's possession, and furthermore, they called for their payment *in money.* There is no evidence or possible ground for an inference that Minter agreed to accept securities rather than cash in payment of her claim. If it be asserted that there was an inference of her consent to accept payment in a medium different than that called for in her notes, then the result reached by the majority would require the building of an inference upon an inference; that is, first an inference of payment, and then the further and additional inference that a different medium than cash was acceptable to Minter in payment of Birch's obligation to her.

It is also pertinent to observe that even if it be assumed that the debt was paid by the stock transfers prior to 1934, we have the notes themselves which were executed *after* those transfers. Such instruments are presumed to be supported by adequate consideration. (Civil Code, sec. 3105.) There is no evidence rebutting that presumption. The transfers of the stock having occurred prior to their execution could not upon any theory be deemed a basis for an inference of payment. Furthermore, the execution of the notes after the transfer gives rise to the inference that the stock transfers were not payment. There is no room for a contrary inference.

In this connection it should be noted that the majority

opinion fails to consider plaintiff's own testimony that his position would have been no different even if the stock had been *given* by Birch to Minter. He testified: "Q. I am going to ask you, Dr. Campbell, whether or not if you knew the fact to be that Miss Minter had taken the Birch Storage stock *as a gift* from Mr. Birch it *would have* also *induced you to make the contract of August 1, 1935?* A. That fact alone? Q. Yes. A. No. Q. Would that have assisted in inducing you to make the contract of August 1, 1935, if you knew that instead of Mr. Birch putting it up as a security for a loan with Miss Minter that in effect Mr. Birch had given her the stock? A. *Yes, I think it would have been about the same,* it would have been lowering his assets.'' Thus, even if Birch gave the stock to Minter, plaintiff would have felt he had been defrauded when in fact he would not have been.

In addition to the foregoing, it must not be forgotten that in an action for damages for fraud the burden of proof of all of the elements thereof, including the falsity of the representations, rests upon the one asserting the fraud. (*McEwen* v. *New York Life Ins. Co.,* 42 Cal. App. 133 [183 Pac. 373]; *Moore* v. *Giffen,* 110 Cal. App. 659 [294 Pac. 730]; 12 Cal. Jur. 816, 818.) Plaintiff failed to meet that burden with evidence of any probative force. On the contrary the evidence shows the truth of the existence of the indebtedness to Minter. This is especially true in the light of the firmly established rule that fraud is never presumed, except under certain circumstances where fiduciary relations exist, rather the presumption is in favor of fair dealing. (Code of Civil Procedure, sec. 1963 (19); 12 Cal. Jur. 816, 818.)

The undisputed evidence in the record discloses that during the three or four years immediately preceding August 1, 1935, defendant A. Otis Birch became seriously involved financially and his obligations increased to such an extent that he was having great difficulty in meeting them; in fact, plaintiff had recovered two judgments against said defendant for rent which had accrued under the lease in question and plaintiff had been unable to enforce satisfaction of these judgments. Plaintiff does not seriously question the fact that Miss Minter was financially able to make the loans to defendant A. Otis Birch which formed the basis of the representations which plaintiff now asserts were untrue. There was no direct evidence offered to contradict the testimony of defendant A. Otis

Birch and Miss Minter that the indebtedness claimed did actually exist, and there is no evidence from which an inference can be drawn that such indebtedness was fictitious or that the representations made by defendant A. Otis Birch to plaintiff in relation thereto were false.

Of course, if the evidence is insufficient to establish the fraud on the part of Mr. Birch, then Minter and Mrs. Birch necessarily are not liable. But assuming it is sufficient, there is a total lack of evidence to charge Minter and Mrs. Birch with Mr. Birch's fraudulent representations. It is conceded in the majority opinion that neither Mrs. Birch nor Minter made any representations to plaintiff, fraudulent or otherwise. In regard to Mrs. Birch, there is no evidence that she had any knowledge that the indebtedness to Minter was fictitious or that any representations were made by her husband in connection therewith. The sole evidence in the record touching upon her connection with the transaction is that she knew nothing about Birch's business transactions; and that she was anxious to have the transaction settled. Surely, that is not sufficient to support a judgment against her.

The basis stated in the majority opinion for holding Minter liable as a conspirator is that she must have known that the indebtedness between her and Birch was fictitious. She made no representations, had no knowledge of any being made, or of the settlement transaction between Birch and plaintiff. *There is no showing of any plan, or scheme, or agreement between Birch, Minter and Mrs. Birch to engage in a conspiracy to defraud plaintiff*. It is essential to establish a conspiracy that a common plan and design for concerted action be proved. There is no evidence of such an agreement.

For the foregoing reasons, I believe that the judgment should be reversed.

Shenk, J., and Curtis, J., concurred.

Appellants' petition for a rehearing was denied April 2, 1942. Shenk, J., Curtis, J., and Carter, J., voted for a rehearing.