[S. F. No. 1830.    Department Two. — December 4, 1901.]

## D. S. LEVY, Assignee, etc., Appellant, v. ALEXANDER IRVINE et al., Respondents.

INSOLVENCY — ACTION BY ASSIGNEE — PREFERENCE OF CREDITOR — NOTICE OF INSOLVENCY — VERDICT AGAINST EVIDENCE. — In an action by an assignee in insolvency to recover the value of goods of the insolvent attached and sold by a creditor, a verdict for the defendant is against the evidence, where it appears without conflict that the creditor either knew or had reasonable cause to believe that the debtor was insolvent within the meaning of the statute, and that the debtor also knew that fact, and that the purpose of both of the parties in procuring the attachment, judgment, and execution was to give a preference to such creditor, and prevent the property of the insolvent from being distributed ratably among his creditors.

ID. — MEANS OF KNOWLEDGE OF INSOLVENCY — CREDITOR PUT UPON INQUIRY. — Where the creditor had full means of knowledge of the debtor's insolvency, and ample opportunity to discover the facts from the books of the debtor, placed in his hands, if he failed to investigate when thus put upon inquiry, he is chargeable with all the knowledge of the insolvency which he would reasonably have acquired if he had performed his duty.

ID. — WILLFUL IGNORANCE EQUIVALENT TO KNOWLEDGE. — A creditor cannot willfully shut his eyes to the means of information known to be at hand, and if he does so, his willing ignorance must be regarded as equivalent to actual knowledge.

APPEAL from an order of the Superior Court of the City and County of San Francisco denying a new trial. John Hunt, Judge.

The facts are stated in the opinion.

Edward Myers, and H. H. Lowenthal, for Appellant.

Charles F. Hanlon, for Respondents.

CHIPMAN, C.—Plaintiff is the assignee of James Clulow, an insolvent debtor, and brought the action, under section 55 of the Insolvent Act of 1880, against Alexander, James, and William Irvine, partners as Irvine Brothers, and D. E. Besecker. The object of the action was to recover the value of certain goods attached and sold at the suit of Besecker against Clulow. Mr. Besecker is a practicing attorney and a professional collector, and was the nominal plaintiff, and brought this latter suit for the benefit of Irvine Brothers on Clulow's note, assigned by them to him. The cause was tried with a jury, and defendants had the verdict. Plaintiff appeals from the order denying his motion for a new trial. He contends that the evidence is insufficient to sustain the verdict, and this is the principal question in the case. As we think this contention must be sustained, it becomes necessary to state the evidence somewhat at length. Clulow kept a retail shoe-store in San Francisco. Irvine Brothers were grocers, and had several stores in that city. The firm assisted Clulow by occasional loans of money; eighteen different amounts were loaned to him, aggregating $2,779.49. The firm loaned Clulow twenty dollars on August 7, 1894. James Irvine, one of the firm, testified that at the time they made this loan he told Clulow that he wanted to have a talk with him at his (Clulow's) store, and they met there by appointment on the following Sunday, August 13th. Irvine took with him a card on which were written the dates and amounts of the several loans made by the firm to Clulow to that date, which showed the total to be $2,704.49. Irvine asked Clulow to show him the account in his ledger, which Clulow did, and Irvine found that some of the notes were not entered, but Clulow agreed that the card was right. During the following week, on August 17th, not being able to pay his rent, Irvine Brothers advanced Clulow $75 more, and this brought the account to $2,779.49. Irvine testified, that at

this time Clulow said he owed Johnson & Co. a bill of about one hundred dollars, which he had promised to pay the following Monday morning, August 20th, but could not, and he asked Irvine Brothers to advance the amount; that he, Irvine, promised to see his brother, Will Irvine, about it, and they arranged to meet Clulow at his store the following Sunday, August 19th, but, after talking the matter over, they refused to make the loan; James Irvine met Clulow on Sunday, the 19th, and told him they would "close him up in the morning, or attach him in the morning"; adding, "So in the morning I went to Besecker and I told him to attach the store. I went down-town with Besecker in his buggy; he went to his office, and he told us that we had better have one note to cover all the other small notes, so as to save trouble. Besecker asked me to bring Clulow around to his office, and I did so, and the other note was drawn by Besecker and acknowledged by Clulow." The note included $456, the amount of two notes due one Hutchinson and one Thompson, and this brought the entire amount to $3,235.49, the amount sued for by Besecker. Just how the Irvine Brothers came to hold these last two notes or to include them in the settlement note is not explained. Clulow denies that they were intended to be included in the Besecker note, but the evidence shows that in no other way can the amount be accounted for, and that Clulow executed the new note in Besecker's office is clearly proven. Irvine testified in chief that in his conversation with Clulow, "to the best of his recollection, Clulow mentioned the only bill that was due or that he had to pay was Johnson's bill and some other bills that were not due, that he could meet as they came along, or something to that effect." He further testified that when he loaned the seventy-five dollars, to the best of his knowledge he did not know "of anything outside of these small bills which he said he would meet as they came along, and the Johnson bill." On cross-examination, he was shown the ledger, and was asked if, when he went to Clulow's store, he examined any accounts other than his own. He answered: "I do not remember of looking at any other individual account on that day besides our own, nor before or after that day. I do not remember whether I saw any other account. I was there, at the store, two Sundays before it was closed. I was also there the Sunday preceding the Monday morning it was closed; it was early Sunday afternoon when I got there,— twelve or one or two

o'clock. I stayed there two hours. We got talking over what he thought he could do about paying our bill. . . . I remember Clulow had been promising right along to start in and pay us a certain sum each month on our account; he said that he would get the stock up a little, and he thought he would see his way clear to pay us certain moneys on account. On this particular Sunday, as far as I can recollect, he mentioned about this Johnson account, and he said that after that was met, and some other small bills, he thought he would be able to start in and pay us some money each month. But before he could do that he wished us to advance some money to buy some goods to stock up a little with. . . . Of course we had many other words, but I do not remember them. I told him I would not advance him any more money until I could consult my brother Will. I don't think I told him I first wanted to see how he stood. I asked him about it, of course, and he gave me some kind of a statement that was not satisfactory. I don't remember what it was or what he said." He was asked if Clulow told him about Bannister & Co.'s bill of fifteen hundred dollars, and he answered, "I don't think I knew the indebtedness to Bannister & Co. I think he mentioned a note for one hundred and fifty dollars about due on the Bannister account, but I do not remember when the note was due or anything about it. I knew he owed Bannister & Co. some money, but I did not know the amount. I knew he was buying boots and shoes from Bannister & Co. I believe Clulow mentioned to me a note coming due to Bannister & Co.; and after that note was paid and Johnson's he would soon be able to pay us some money." He was asked whether mention was made of August Lane & Co. having two notes past due, and answered: "I don't know about his mentioning that the firm had two notes. I will not swear he did not. Q. Did he tell you about owing $159 to the shoe-house of Cahn, Nicklesburg & Co.? — A. He may or may not. I would not swear. He did not mention any note to them. Q. After that two-hours' talk there, you came to the conclusion that you would not give him a chance to take those notes up in monthly payments? — A. When I came to think it over, he had made so many promises in the same direction, I concluded that I could place no confidence in his promises, and I decided that it would not be safe to do so." After speaking of meeting Clulow, on the 19th, at his store, he said he met Clulow at witness's store on Polk

Street, with his brother William, and the matter of further advancements was talked over. He testified: " He [Clulow] mentioned the Johnson bill, due on Monday morning, and wanted us to advance this money, so we decided that we would not advance that money. I think he did tell me, perhaps, that Johnson had threatened an attachment. . . . I told him I thought very likely we would attach him Monday morning. . . . I do not remember that I told him I wanted to get in ahead of Johnson; I will not swear whether I did or not." He was asked if he did not say he ought to be protected in preference to anybody else. " A. I do not remember the conversation. Q. Will you say that you did not ask him to give you a preference as against any other creditor; that you were entitled to it?—A. I don't remember whether I did or not; I may or may not have told him so." He was asked if he did n't say he had furnished cash, and others had given him goods, and for that reason· he was entitled to a preference. "A. I don't know. I felt pretty anxious about my money, but I cannot remember what I said to him; that was Sunday night. I was there Sunday night, August 19th, in the store. I got there in the afternoon, and may have stayed one or two hours at that time." In this connection it may be stated that Clulow testified that Irvine examined the ledger carefully. But Irvine testified that he looked into it to see how his own account stood, but did not examine the other accounts in it. The ledger was used at the trial, and the evidence was that there were several accounts in it besides Irvine Brothers', showing quite large indebtedness. There were some of his creditors, also, whose names did not appear in the ledger, but were scheduled by Clulow in his insolvency petition filed August 28, 1894, the total indebtedness being over nine thousand dollars, including Irvine Brothers' claim. William Irvine testified: "I saw Mr. Clulow on the Sunday before the attachment. The store was closed on Monday. . . . I knew my brother James was in Clulow's store a part of the time that Sunday. . . . He said he was down there, looking at Clulow's standing. He was anxious about his money; as near as I can remember those are the words he said. . . . He did not tell me anything about how much Clulow owed, or how much he owed to other creditors." The witness could not remember what Clulow said about his business affairs or indebtedness; witness "had no talk with him about how much he owed"; his "brother did

all the talking"; could not remember that his brother James
asked Clulow for money; "he wanted to see how his standing
was, of course, my brother did; he did not tell me what his-
standing was.   When my brother asked him about his stand--
ing, I cannot remember what Clulow said to him.   Clulow
wanted money, but I don't know how much he wanted, nor
what he wanted the money for."   When asked if Clulow did
not say he wanted money to pay creditors who were pressing·
him, the answer was: "I cannot remember; Mr. Clulow might
have been in the store half an hour.   I cannot remember what
was said there."   He was asked: "Did you, that night, tell
Clulow to go to the store and take out his tools and clothes?—
A. Yes, sir; I think I am sure of that."   Being asked what·
prompted the advice, he replied: "We had an idea we would
close him up the next day; I believe I told Clulow so; that
was the understanding between us three; I don't remember
whether I told him or not."   About nine o'clock the next,
morning, James Irvine took Clulow to Besecker's office; Clulow
stated to Besecker that he and the Irvine Brothers had agreed
as to how much he owed them, and he handed Besecker a
bundle of notes and asked him if they could not be put in one·
note, dating the note one week back, the date of the settlement.
Besecker asked him "if he owed anybody else any money, and:
he said he owed a few dollars, but it did not amount to any-
thing."   The note for $3,235.49 was then drawn by Besecker·
and signed by Clulow, and was dated August 13th, payable·
one day after date, and was assigned to Besecker.   Besecker
testified: "I demanded the money from him then; he said he·
could not pay it; then he went away."   Besecker explained to
Irvine that it would take a long time to prepare the complaint
with all the notes in it, and that he (witness) preferred to·
have it in one note.   Irvine replied, "Well, I have no doubt
Clulow will sign it," and witness called Clulow into his office,
and the figures were gone over, and he signed the note.   Be--
secker testified that he then prepared the papers in the attach--
ment suit, "filed the complaint (which was verified by Irvine),
got out an attachment, and went down with the deputy sheriff
and attached the store.   Clulow was there when I arrived,.
about eleven o'clock, with the sheriff, and he said to us, 'Lock
up the place.'   We locked up the place, and he went away.   I
said to him as I left him, 'Clulow, if you have time this after-
noon, come in and see me,' and he said he would."   At one·

o'clock, Clulow went to Besecker's office; a clerk was called in and served the complaint and summons. After the clerk had gone out, Besecker said: "Now, what is the use of having these ten days of sheriff's fees piled up? You may just as well shorten the time. These are your only creditors, I understand; what is the use of having all this time wasted? He said, 'Well, if you want me to sign anything, I will sign it.' I dictated to my stenographer in the room this answer, and he waited until she wrote it out, and after she wrote it, I read it to him again." The witness then stated that Clulow went before a notary with the answer. It is dated August 20th and was verified that day, and is marked "Filed August 21st." It reads as follows: "Now comes the defendant, James Clulow, and consents and authorizes judgment to be taken in this action against him, in favor of said plaintiff, for the sum of $3,245.49 and costs of suit." It recites that defendant borrowed money from Irvine Brothers at various times, and gives a schedule of the amounts and dates, commencing March 1, 1893, and ending August —, 1894. This last item was seventy-five dollars, and was the money advanced August 17th,—in fact, four days after the date of the note sued on by Besecker. Recites that the money was used in his business and "the paying off of a certain chattel mortgage made by this defendant to one Mrs. Quinting for fourteen hundred dollars or thereabouts; that on August 13, 1894, said defendant made, executed, and delivered to said Irvine Brothers his certain promissory note, which is the note mentioned in this action and sued on herein for the amount therein mentioned of $3,235.49." Besecker took the answer into court and filed it the next morning, August 21st, and on his own motion, in open court, judgment was ordered, and he went into the clerk's office and had the clerk enter the judgment. It reads: "In this cause, upon reading and filing the consent of the defendant herein, it is ordered," etc. Besecker then had execution issue that afternoon and levied on the property attached, and the entire stock of goods of Clulow was sold, bringing $1,640, which the evidence shows was after spirited bidding by competitors at the sale, and the evidence also shows that the property brought all it was worth. There was a chattel mortgage on the entire stock of goods, which had been recorded, but the mortgagee did not take possession. The property was bought in by one Downey, Irvine Brothers furnishing the money, to whom Downey turned over the goods.

They paid the chattel mortgage, and after paying sheriff's costs, James Irvine testified they realized "only about four hundred dollars." Besecker testified, on cross-examination, that before the complaint was prepared Clulow told him Johnson & Co. were pressing him and threatening to attach him, and that he, Besecker, wanted to get in his attachment first; that when he attached the goods he did not look into the books to ascertain Clulow's indebtedness to other creditors; that Clulow told him "he owed a few dollars," but witness did not inquire to whom, nor did he ask him if the books showed his indebtedness.

The essential facts are without conflict. It is not necessary to look beyond the testimony of defendants' witnesses to discover the true character of the transaction. It is perfectly evident that Irvine Brothers knew, or had reasonable cause to believe, that Clulow was insolvent, within the meaning of the statute,—i. e., was unable to pay his debts from his own means, as they became due, and that Clulow also knew this fact in August, 1894; the evidence admits of but one reasonable or rational inference as to the purpose of these parties in procuring the attachment, judgment, and execution, and that purpose manifestly was to give Irvine Brothers a preference, and prevent the property of Clulow from being distributed ratably among his creditors. It is idle to argue that Irvine Brothers did not know or actually believe Clulow to be insolvent, for they had reasonable cause to believe that he was insolvent, and that is sufficient to satisfy the statute. (*Washburn* v. *Huntington*, 78 Cal. 573.) Irvine Brothers had the means of knowledge, and they were put upon inquiry by many facts and circumstances to which they themselves testify. James Irvine had the ledger of Clulow in his hands, and looked into it; he visited the store several times to ascertain the standing and condition of Clulow, —at one time, on Sunday, August 19th, spending two hours alone with him. There was ample opportunity to make an approximate estimate of his stock on hand, and Irvine, being himself a merchant doing large business, was familiar with the work; he had Clulow's books before him, and yet with all these means he testified that he did not do the very thing which common prudence demanded that he should do. Failing to investigate when put upon inquiry, he is chargeable with all the knowledge which it is reasonable to suppose he would have acquired if he had performed his duty. A creditor cannot willfully shut his eyes to the means of information which he knows

is at hand, and if he does so, his willing ignorance is to be regarded as equivalent to actual knowledge. That the purpose of Clulow and Irvine Brothers in procuring the attachment was to give the latter a preference in the face of reasonable cause to believe, if not actual knowledge, that Clulow was at the time insolvent, is too plain from the evidence to admit of any reasonable doubt. It is not necessary to consider those cases where the knowledge or intent exists in the mind of one of the parties alone. (*Tapscott* v. *Lyon*, 103 Cal. 297; *Haas* v. *Whittier*, 97 Cal. 411, and other cases.) Here, the evidence, without conflict, shows that they acted together, Clulow with actual knowledge of his insolvency, and Irvine Brothers with at least reasonable cause to believe him to be insolvent. Much comment of counsel is made as to the character of the answer of Clulow to Besecker's suit, dictated and procured by Besecker himself. Appellant insists that it was a confession of judgment, and that the presumptions which attend such an act must be indulged. Respondents contend that it was an answer in the case, and must be treated as any other answer. It certainly was not such technical confession of judgment as is contemplated by sections 1132 et seq. of the Code of Civil Procedure. But as evidence of the intention of the parties to enable the plaintiff to get his judgment and execution served before other creditors could avail themselves of the Insolvent Act, and as evidence of an intention by the parties that Irvine Brothers should have a preference, it is very significant; and this, with the unmistakable evidence that both knew or had reasonable cause to believe Clulow to be insolvent, together with the other undisputed facts in the case, compels the conclusion that the verdict was without support. The trial court should have granted the motion for a new trial, and, we think, erred in refusing to do so.

It is unnecessary to consider the numerous alleged errors of law committed at the trial.

It is advised that the order be reversed.

Gray, C., and Haynes, C., concurred.

For the reasons given in the foregoing opinion the order is reversed.          Henshaw, J., McFarland, J., Temple, J.

Hearing in Bank denied.

Beatty, C. J., dissented from the order denying a hearing in Bank.