[Civ. No. 14064.   First Dist., Div. One.   June 27, 1950.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Plaintiff and Appellant, v. JOSEPH GREENBACH et al., Defendants and Appellants.

Erskine, Pillsbury & Tulley, Ulysses A. Gribble and George D. Schilling for Plaintiff and Appellant.

Thos. J. Riordan, Young, Hudson & Rabinowitz and Leon A. Blum for Defendants and Appellants.

PETERS, P. J.—This action was commenced by the bank against Greenbach and others to set aside the settlement, for a fraction of its face value, of a judgment against Greenbach, held by the bank, on the ground that such settlement had been secured by the fraud and misrepresentations of Greenbach. Over the vigorous objection of defendants that they were entitled to a jury trial, the cause was tried before the court without a jury. Judgment was entered decreeing that the settlement should be set aside because of fraud in its procurement, and awarding to the bank a money judgment for a portion of its demand. The judgment also ordered the other named defendants to apply the property in their hands belonging to Greenbach in satisfaction of the judgment. From this judgment all the defendants and the bank appeal.

### FACTS

The facts as disclosed from the findings and record are as follows:

On November 17, 1939, the bank obtained a judgment against Greenbach for $88,050.66. On January 2, 1940, Greenbach, who had paid nothing on this judgment, began negotiating with the bank for a settlement. During these negotiations Greenbach represented that he was unable to pay the judgment, that he owned no properties not exempt from execution, and that unless he could settle the claims of his various creditors, including that of the bank, he would be forced into bankruptcy. He offered the bank $5,000 in full settlement of its judgment. In connection with these negotiations, and as part of the settlement agreement, Greenbach signed and delivered to the bank an affidavit dated February 5, 1940, in which he averred and agreed that:

"With knowledge that said Bank . . . is accepting said settlement of $5,000.00 only because it relies upon my statement that I have no assets, and upon this affidavit, I hereby certify, state and declare under oath, that I have no property or assets of any kind or nature; no money due me from any person; no real property; no stocks; no bonds; no money in bank; no credits due me; no beneficial interest in any property held by any other person for me; no property standing in the name of assignees; trustees or any other persons whatsoever; for me and for my benefit" with the exception of certain designated properties exempt from execution, and an "Undetermined equity in some shares of stock in the Newbridge Park Realty Co., and Bayshore Realty Co., subject to present negotiations with the record owner thereof.

"I definitely understand and agree that said Bank shall be bound by said settlement and by its acceptance of said $5,000.00 settlement, only upon the condition that the statements herein made by me as to my personal responsibility and as to my assets, are true.

"I further agree that in the event of a rescission of this settlement, the said Bank may retain the sum received hereunder and apply said sum on account of the original obligation, and further waive the right to plead the Statute of Limitations as a defense to said original obligation."

As to the "undetermined equity" in the two corporations above referred to, just prior to the execution and delivery of the affidavit, Greenbach represented to the bank that he owned none of the capital stock of these corporations, that

his sister-in-law was the owner of all of such stock, and that he had worked for her and for the two companies for a number of years at a nominal salary. He told the bank that, after settling with his creditors, he hoped to obtain from his sister-in-law some stock in these two companies.

The trial court found, and the findings are not challenged, that all of these representations were made by Greenbach with the intent of obtaining the settlement of the outstanding judgment by fraud and deceit; that they were false; that the bank believed that these statements were true and had no notice or knowledge that they were not true; and that if the bank had not believed the representations it would not have agreed to the settlement.

The record shows, the trial court found, and such findings are not challenged, that the representations as to assets were false and known by Greenbach to be false, when made by him. In this connection the trial court found that at the time the settlement was entered into, there was owing to Greenbach from the Bayshore Realty Company the sum of $3,272.07; that this amount was on the corporation's books as a credit to him; that, in addition, at that time Greenbach was the owner of one-half of the capital stock of the Mutual Hotel Operating Company, Ltd.; and was the real and beneficial owner of all of the capital stock of the Bayshore Realty Company and the Newbridge Park Realty Company; that on December 2, 1939, all of the shares in these latter two companies (except two shares in each held by other directors) were issued in the name of his sister-in-law, Katherine de Salas; that, after the certificates had been issued to her, they were endorsed by her to Greenbach who kept them under his control; that on December 2, 1939, Greenbach had these certificates cancelled and new certificates issued by these corporations to his wife; that at the time of the negotiations and settlement the shares stood in her name; that she held them for Greenbach and he was the real owner of them; that the statement made by Greenbach in his affidavit that he had an undetermined equity in these shares subject to present negotiations with the record owners, was untrue and false, for he was the real and beneficial owner of all these shares; that on December 2, 1939, Greenbach had de Salas removed as the president and director of these corporations and had his wife appointed in her place; that had the bank known of these holdings of Greenbach, it would not have made the

settlement; that Greenbach had the certificates representing these shares of stock placed in the names of his sister-in-law and wife for the purpose of concealing his assets from his creditors and to avoid paying them; that for many years prior to the settlement these corporations owned real and personal properties of substantial value, and during this period Greenbach owned all of the capital stock, was the managing officer, and completely controlled the corporations for his own benefit, causing valuable properties of his own to be transferred to them; that on January 10, 1940, Greenbach had created the Belle Haven Realty Company, and on February 28, 1940, he had the Bayshore and Newbridge companies transfer a substantial part of their assets (including the Californian Hotel in Sacramento, and other hotels and bars in California) to Belle Haven; that the certificate showing stock ownership in Belle Haven was issued to William Greenbach (Greenbach's son) for the purpose of concealing Greenbach's ownership from his creditors; that Greenbach has always been and is the real and beneficial owner of Belle Haven.

The record shows, the trial court found, and such findings are not attacked, that the falsity of the representations was discovered by the bank under the following circumstances: That on December 19, 1944, Greenbach filed an action in Sacramento against one Casey and the Mutual Hotel Operating Company (which conducted the Californian Hotel) in which he alleged that he had at all times owned one-half of all Mutual's capital stock; that this complaint came to the attention of Clayton, an employee of the bank and the employee who had carried on the settlement negotiations with Greenbach; that subsequent investigations by the bank eventually led to the uncovering of the concealed assets; that, among other things, the bank discovered that in 1930, Greenbach had transferred certain of his hotel properties to his sister-in-law in exchange for property which she claimed to own in Guatemala; that the investigation revealed that his sister-in-law was never the record owner of this Guatemala property, and that no transfer of the property to Greenbach was indicated by the Guatemalan records; that further investigation revealed information which indicated the concealments set forth above.

After making these investigations the bank commenced the instant action on November 9, 1945.

The court further found that the bank had the right to rely and did rely upon Greenbach's representations; that it was not required, after the settlement, to make any investigation

as to the truth of the representations; that the bank acted with reasonable diligence and promptness in investigating the truth of the representations after discovering the complaint in the action against Casey; that in the time which elapsed between the discovery and the commencement of the action, Greenbach did not change his position in any way to his detriment; that the bank was not barred from bringing this action by laches nor by section 338, subdivision 4, or section 343, of the Code of Civil Procedure.

The court also found that the bank did not request information from Greenbach to substantiate his representations as to his assets, because it relied on their truth, as it had the right to do; that the papers and records of Greenbach were not available to the bank at the time of the settlement or thereafter, and none of the public records relating to Greenbach's assets, or the assets of the corporations, would have revealed the true ownership of the properties controlled by Greenbach; that each of the defendants named in the complaint was a party to the fraud and knew that Greenbach was attempting to conceal his assets; that the net worth of Greenbach at the time of the settlement was $100,000.

On these facts the trial court concluded that the bank was entitled to a rescission and cancellation of the settlement, but was not entitled to a judgment for the full amount of the original judgment ($88,050.66), but was only entitled to judgment for $24,300, with 7 per cent interest from February 5, 1940, the date of the settlement agreement. The court arrived at this figure of $24,300 by its findings that if Greenbach, in February of 1940, had divided the $100,000 then owned by him *pro rata* among all his creditors, the bank would have received but $29,300, and that the $5,000 already received should be deducted from that figure. The court also concluded that the other defendants named in the complaint should be ordered to apply property of Greenbach's in their hands to the satisfaction of the bank's claim. Judgment was entered accordingly. Greenbach, the other defendants, and the bank appeal.

### DEFENDANTS' APPEAL

*Were the Defendants Entitled to a Jury Trial Because of the Form of the Action?*

The defendants do not attack the sufficiency of the evidence to support the basic findings that Greenbach knowingly made

the false statements and that the bank relied upon them, but seek to reverse the judgment on other grounds. Their first major contentions are that the complaint was for damages for fraud, that such an action is in law, and that they were entitled to a jury trial as a matter of right. The complaint, as originally filed, set forth the facts substantially as above set forth and prayed for a money judgment against all of the named defendants, including Greenbach. Defendants demanded a jury trial on the ground that the complaint was framed upon the theory that defendants had entered into a fraudulent conspiracy, and prayed for a money judgment in the nature of damages. Such a complaint, it is urged, is in law and not in equity.

This problem was thoroughly discussed before the trial court at the commencement of the trial. The first 133 pages of the transcript contain the account of the battle between counsel over the issue as to whether the action was one in law for money damages, or in equity for rescission. The main contention of Greenbach at that time was that the action was not one for rescission because of the allegations of conspiracy, and because paragraph 1 of the prayer of the complaint alleged: ''Wherefore, plaintiff prays:

''1. That the said settlement of plaintiff's judgment against the said Joseph Greenbach be set aside and that plaintiff have judgment against all the defendants herein, for the sum of $83,050.66 [$88,050.66 less the $5,000 received] with interest thereon at 7 per cent per annum from November 17, 1939.'' During the course of the argument the court indicated that, because of the form of the prayer, it was inclined to grant a jury trial. The bank insisted that what it wanted was to rescind the settlement and to reinstate the judgment against Greenbach and to compel the other defendants to apply the property in their hands belonging to Greenbach in satisfaction of this judgment. The bank finally requested permission to amend the prayer of its complaint to make this position clear. The request was granted. Thereupon, the paragraph above quoted was amended to read: ''Wherefore, plaintiff prays:

''1. That the said settlement of plaintiff's judgment against the said Joseph Greenbach be set aside and plaintiff have judgment against the defendant Joseph Greenbach for the sum of $83,050.66 with interest thereon at 7 per cent per annum from November 17, 1939.''

After this amendment had been allowed, the trial court denied defendants' request for a jury trial.

It should be first pointed out that the trial court acted well within its powers in allowing the amendment to the complaint, even if it be assumed that, by the amendment, the nature of the action was changed from one at law to one in equity. (*Walsh* v. *McKeen,* 75 Cal. 519 [17 P. 673].) The transaction involved in both pleadings is the same, no new cause of action was added, and no legal injury resulted to Greenbach. There was, therefore, no abuse of the wide discretion allowed trial courts in determining whether or not to permit an amendment. (*Woods* v. *Cook,* 14 Cal.App.2d 560, 563 [58 P.2d 965]; *Frost* v. *Witter,* 132 Cal. 421, 424 [64 P. 705, 84 Am.St.Rep. 53]; *Rosemead Co.* v. *Shipley Co.,* 207 Cal. 414, 420 [278 P. 1038]; *Farnsworth* v. *Hunter,* 11 Cal.2d 27, 31 [77 P.2d 840]; *Peters* v. *Binnard,* 219 Cal. 141, 148 [25 P.2d 834].)

It is not disputed that an action for rescission is equitable in nature in which a jury trial is not allowed as a matter of right. It is also clear that the mere fact a conspiracy is charged in the complaint does not change the nature of the cause of action. In 5 California Jurisprudence, page 528, section 29, the proper rule, supported by many authorities, is stated as follows: ''It is a general and well-settled principle of law that, where two or more persons are sued for a civil wrong, it is the civil wrong resulting in damage, and not the conspiracy, which constitutes the cause of action.'' In the same volume, page 533, section 34, it is stated: ''Where two or more persons are sued for a joint wrong, it may be necessary to prove a previous conspiracy between them in order to secure a joint recovery; but it is not necessary to aver this previous combination in the complaint, and if averred, it is not to be considered as of the gist of the action.''

It is the theory of Greenbach that the complaint here involved was patterned after that in *Campbell* v. *Birch,* 19 Cal. 2d 778 [122 P.2d 902], and that such a complaint states but one cause of action, and that is a cause of action against all the named defendants for fraudulently conspiring to induce the bank to settle with Greenbach. There can be no doubt that the complaint is quite similar to that in the Birch case. But the big difference is that in the Birch case the relief sought was money damages against all the defendants, and there was no attempt to rescind, while in the instant case rescission is the gist of the action. Where a creditor is induced by the fraud of the debtor to settle a judgment for less than its face value, the creditor may either affirm the contract and sue for

228

damages for the fraud, or he may rescind. (*Campbell* v. *Birch*, at p. 791.) The damage action is legal, while the rescission action is equitable. Obviously, the allegations of the complaints in either type of action will necessarily be quite similar, and the solution as to the nature of the action will depend on the type of the relief sought against the debtor and against the co-conspirators.

A reading of the complaint, as amended, demonstrates that what the bank sought was rescission. Although the defendants, other than Greenbach, are constantly referred to in the complaint, the amended prayer and the argument of the bank's attorney during the discussion over the allowance of a jury trial make it quite clear that the bank sought a cancellation of the settlement agreement and reinstatement of the judgment—i.e., a rescission. It is also quite clear that the bank sought no money damages from the other defendants. They were joined in order that the bank, if entitled to rescind, could secure the properties that had fraudulently been conveyed to them. This is clearly demonstrated by the four paragraphs of the prayer of the complaint following the amended paragraph, and which were not amended, in which the bank prayed that the other defendants be required to account for all properties and their proceeds that had been received from Greenbach, that such defendants be enjoined from disposing of these properties, or any interest in them, pending the outcome of the action, and that a receiver be appointed to hold these properties until final judgment.

It is apparent that what the complaint sought was to set aside the settlement and to reinstate the original judgment against Greenbach. The original judgment was for $88,050.66. That was the precise amount, less the $5,000 already received, set forth in the prayer. No money judgment was sought against anyone but Greenbach. The proper rule in such cases was stated as follows in *Estate of Cazaurang*, 75 Cal.App.2d 217, 225 [170 P.2d 694] : "In determining whether an action is legal or equitable, and consequently whether a jury may be demanded as a matter of right, the court is not bound by the form of the action, but rather by the nature of the rights involved, as determined from the whole of the pleadings, and the facts of the particular case." The same rule is set forth in 15 California Jurisprudence, page 334, section 12, which adds : "The allegations of the complaint, the answer, and the cross-complaint may be considered, as may also the prayer for relief in the complaint and in the answer."

Similar language is to be found in *Bettencourt* v. *Bank of Italy etc. Assn.*, 216 Cal. 174, 179 [13 P.2d 659]; *Cauhape* v. *Security Savings Bank,* 127 Cal.197, 201 [59 P. 589]; *Wulfjen* v. *Dolton,* 24 Cal.2d 891 [151 P.2d 846]. Greenbach argues that the Bettencourt case was overruled in *Pacific Western Oil Co.* v. *Bern Oil Co.*, 13 Cal.2d 60, 69 [87 P.2d 1045]. An examination of the two cases demonstrates, however, that the Bern Oil Co. case did not overrule the Bettencourt case on the point here involved, and that as to that point the Bettencourt holding, and the holding in the above cited cases, stand unimpaired. The Bettencourt case had held, in addition to the rule under discussion, that a party is not entitled to a jury trial in an action essentially equitable but in which a legal remedy is sought. That was the point that was overruled in the Bern Oil Co. case. The proper rule applicable to that problem is that ''even though the action is essentially equitable, if the plaintiff requests legal relief, the parties are entitled to a jury trial on the legal issue.'' (*Crouser* v. *Boice,* 51 Cal. App.2d 198, 200 [124 P.2d 358].) The same case (p. 203) pointed out that the mere fact that damages may be awarded by the trial court or are sought by the parties does not, in itself, require a jury trial, because, if the action is equitable in nature, the court, in the exercise of its equity jurisdiction, may award damages.

The proper application of these rules was well illustrated in *Peterson* v. *Peterson,* 74 Cal.App.2d 312 [168 P.2d 474]. That was an action to quiet title to property, to recover its reasonable rental value, to cancel a deed of trust, and to recover damages for fraud. It was properly held that as to the issues raised by the cause of action based on fraud and the prayer for money damages the parties were entitled to a jury trial as a matter of right, because that action was legal.

From these cases it can confidently be asserted that where no individual money damages are sought, and where the plaintiff seeks only to rescind and to recover the fraudulently conveyed assets, the action is equitable, and a jury trial is not a matter of right. That is this case. The trial court properly denied the request for a jury trial.

*Contention that Defendants Were Entitled to a Jury Trial Because of Their Plea of the Statute of Limitations.*

The answer of defendants pleaded the statute of limitations by reference to sections 338, subdivision 4, and 343, of the

Code of Civil Procedure. The precise point sought to be raised by defendants in reference to the statute of limitations is not very clear. In their opening brief they argue that in some way their plea raised a legal issue that should have been tried before a jury. ▮ It certainly is not the law that a plea of the statute of limitations *ipso facto* turns an equitable action into a legal one. ". . . a plea of the statute of limitations does not change the character of an action from one in equity to one in law, for the statute may be availed of as a defense in suits in equity as well as at law." (15 Cal.Jur. p. 338, § 14; see, also, *Hancock* v. *Plummer*, 66 Cal. 337, 338 [5 P. 514].)

Moreover, these defendants do not deny but admit the execution by Greenbach of the affidavit of Februray 5, 1940, above quoted, and in which Greenbach specifically waived the statute of limitations.

These defendants quote from *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958], and *West* v. *Great Western Power Co.*, 36 Cal.App.2d 403 [97 P.2d 1014], to the effect that, in such actions, whether one has notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and whether the prosecution of an inquiry would have revealed such fact, are questions to be determined by the trial court or jury. They also contend that whether the bank acted reasonably in failing to discover the fraud is a question of fact which should have been settled by a jury, and cite *Taylor* v. *Wright*, 69 Cal.App.2d 371, 383 [159 P.2d 980]. Just what solace defendants secure from these cases is not clear. It seems to be their thought that all questions of fact, whether the action is at law or in equity, must be settled by a jury. To state the contention is to refute it. ▮ Of course, if the action is in equity the trial judge is empowered to find the facts—if at law, a jury has that power. (See *Fish* v. *Benson*, 71 Cal. 428, 434, 435 [12 P. 454]; cases collected 12 Cal.Jur. p. 837, § 83.)

In their closing brief the defendants try to explain what they have in mind in reference to this statute of limitations point. They state that a jury trial was required because this statute of limitations plea is "based upon the fact that the complaint was drawn on a theory of recovery for a money judgment by reason of the alleged fraudulent scheme perpetrated by the defendants. . . . Appellant [Greenbach] is standing on the proposition that the complaint was drawn on the law side of the Court." (Defendants' Closing Brief, p. 9.)

This is but another way of raising the basic point that the action is one for damages for fraud. Once it is determined that the action is for rescission and therefore equitable, this argument falls.

*Defendants' Contention That Their Motion for*
*a Nonsuit Should Have Been Granted.*

This is perhaps the major point raised by the defendants. They argue that the motion for a nonsuit should have been granted by reason of the statute of limitations and laches. This argument really amounts to an attack on the findings that the bank was not guilty of negligence in failing to discover the fraud sooner. ▮▮ They argue that, inasmuch as Greenbach's affidavit disclosed an "undetermined equity" in the shares of the Newbridge Park Realty Co. and of the Bayshore Realty Co., the bank, as a matter of law, was put on notice and was bound to pursue its inquiry on this point or be bound by the settlement. It is argued that the information contained in the affidavit is much more substantial than the information that came to it in January, 1945, when it investigated and discovered the fraud. It is contended that the record shows that the bank made no investigation of the nature of this "undetermined equity." It is also argued that the record shows that in 1942 the Newbridge and Belle Haven companies filed with an Oakland branch of the bank a statement setting forth all the assets and liabilities of the two corporations in connection with a loan Greenbach was seeking from the bank. It is urged that, although this statement put the bank on notice, no investigation was made. This, according to Greenbach, amounted to laches as a matter of law.

The evidence on these points is as follows:

The bank's representative during the negotiations leading to the settlement was Clayton, an assistant cashier of the bank. Clayton testified that Greenbach had told him that he had no interest in the two realty corporations referred to above; that these corporations were owned by Greenbach's sister-in-law, Katherine de Salas; that Greenbach had organized the corporations for her and served as general manager; that Greenbach told him that he had been working for his sister-in-law as manager of these corporations for a number of years; that their success was due largely to his efforts, and that after he had settled with his creditors, he intended to demand of Katherine an interest in the business. Thus, according to Clayton, Greenbach's statements were to the effect that he

had no legal claim, but some sort of a moral claim to an interest in the business. The record does show that when the original affidavit was prepared by the bank, it called for Greenbach to aver that he had no property interests. Greenbach refused to sign this affidavit and insisted that the amended form of the affidavit be substituted. But, at that time, as the above evidence shows, the bank, through Clayton, believed that this "moral claim" was what the "undetermined equity" clause referred to. Clayton checked the assessment rolls in Sacramento, San Mateo and San Francisco Counties to determine whether Greenbach and his wife had any property listed there, and also to see whether the two realty corporations possessed property there. The account books and records of the Bayshore and Newbridge Realty corporations were not investigated, however, because Clayton believed from all the information which he could gather, including Greenbach's own statements to him, that Greenbach had no interest in these corporations. Clayton's report to the General Finance Committee of the bank recommended that Greenbach's offer of settlement be accepted, and contained the following paragraph: "Several years ago his sister-in-law, Katherine G. de Salas, inherited some money from her deceased husband, who formerly owned a coffee plantation in Guatemala. With Greenbach's assistance, she organized the Newbridge Park Realty Company, the Bayshore Realty Company, and the Belle Haven City Building Company. She owns the stock in these various Corporations with Greenbach operating them as general manager. Various investigations have been made, both by this Department and, in a number of instances, by outside creditors into the affairs of both Greenbach and these Corporations in an attempt to uncover assets. To date no one has been successful in proving that Greenbach actually is possessed of any assets."

Greenbach claims that the bank had in its files many documents which gave it complete information concerning the assets, holdings and interests of the realty companies, and that the bank, therefore, had notice of Greenbach's status concerning these companies. The bank lists these documents as Dun & Bradstreet report on Bayshore dated September 28, 1939; Bayshore's application for a building mortgage loan dated February 16, 1937; September 30, 1938, consolidated balance sheet of Bayshore and Newbridge filed with the F.H.A.; profit and loss statement for 1938 of these companies filed with the F.H.A.; and the consolidated balance sheet of

December 31, 1938, filed with the F.H.A. The bank states, and the documents show, that in none of them was any interest of Greenbach in these corporations disclosed. Some of them never came to or went through the bank but went directly to the F.H.A., and there was nothing contained in them which would have given the bank notice of Greenbach's interests in the corporations. Greenbach states in his brief that he gave Clayton a list of all of his assets and liabilities prior to the signing of the settlement. The bank asserts that there is no evidence to show that this list was ever given to Clayton or to the bank, and that it would have been ridiculous for the bank to have entered into a $5,000 settlement if it had received such a list. The record shows that the title to these properties was never in Greenbach's name.

The record also shows that Greenbach was represented during the settlement negotiations by an attorney who testified that he had told Clayton that there was a "vague understanding" that Greenbach was to participate in the assets of the two corporations, and that he had told Clayton substantially the same story as did Greenbach. It also appeared that prior to the date the settlement agreement was signed, de Salas had agreed to transfer all of the stock in these companies to Greenbach's wife, and had resigned as president and director of both corporations. Admittedly, the attorney did not disclose these facts to Clayton.

On these facts Greenbach et al., argue that, as a matter of law, the bank had constructive notice of his interest and assets, and its failure to investigate must be held to be a bar to the action.

It is, of course, the law that a party has a duty to investigate where he has notice of facts which indicate fraud. (*Levy* v. *Irvine*, 134 Cal. 664, 671 [66 P. 953] ; *Merrill* v. *Los Angeles Cotton Mills, Inc.*, 120 Cal.App. 149, 157 [7 P.2d 329] ; *Merchants' Ice etc. Co.* v. *Globe Brew. Co.*, 78 Cal.App.2d 618, 624 [177 P.2d 963].) But this duty to investigate is a relative matter. The creditor has a legal right to rely upon the statements made by the debtor. If the debtor is guilty of deliberate fraud, it is not good morals, nor does it make good sense or good law, to say that the creditor was too credulous because he placed too much reliance on the statements made by the fraudulent debtor, and is therefore barred.

The principles applicable to such an action are well settled. It is established law that a debtor seeking to compromise an admitted debt must make a full and complete disclosure, and

must exercise the utmost good faith. In *Boas* v. *Bank of America*, 51 Cal.App.2d 592, 597 [125 P.2d 620], this rule was stated as follows: ". . . in effecting a composition agreement the law demands the utmost good faith on the part of the debtor and it will not permit him by pretending to be insolvent to induce his creditor to accept a small portion of the debt in lieu of the whole when in fact his property is amply able to pay the creditor in full; . . . good faith requires of the debtor, before he shall be permitted to profit by a composition agreement, to make a full and fair disclosure of his effects, and that no concealment, deception or fraud should be practiced . . . and in dealing with the question of false representations it is held generally that even though one may be under no duty to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiry, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure." (See, also, *United States Nat. Bank* v. *Stiller*, 216 Cal. 324, 332 [14 P.2d 78].)

It is also well settled that when a fact is peculiarly within the knowledge of the person making the representation and not within the knowledge of the person to whom it is made, the latter has the right to rely upon the representations of the former respecting such fact. (See cases collected 12 Cal. Jur. p. 751, § 30.) In the same volume, page 758, section 34, after quoting from *Dow* v. *Swain*, 125 Cal. 674 [58 P. 271], it is stated: "The party making the representation cannot escape responsibility by showing that the other party might have ascertained that such representation was untrue, or had no right to believe it. Where one is justified in relying, and in fact does rely, upon false representations, his right of action is not destroyed because means of knowledge were open to him. In such a case, no duty rests upon him to employ such means of knowledge, even though by reason thereof, in the absence of any representation at all, a constructive notice would be inferred. The doctrine of constructive notice does not apply where there has been such a representation of fact. If the representation is of a character to induce action and does induce it, that is enough. It matters not that a person misled may be, in some loose sense, negligent, for it is said not to be just that a man who deceives another should be permitted to say to him, 'You ought not to believe or trust me,' or 'You are yourself guilty of negligence.' " (See, particu-

larly, *McKeehan* v. *Pacific Finance Corp.*, 120 Cal.App. 578, 588 [8 P.2d 213]; *French* v. *Freeman*, 191 Cal. 579, 586 [217 P. 515].)

While there is a reasonable duty to investigate, and while it is generally true that notice of facts and circumstances that would put an ordinary man on inquiry may be held to be the equivalent of discovery (see cases 12 Cal.Jur. p. 795, § 59), the question as to whether the known facts were sufficient to put the defrauded person on inquiry is one of fact for the trial court. (*McCray* v. *Title Ins. & Trust Co.*, 12 Cal.App. 537 [55 P.2d 1234]; *West* v *Great Western Power Co.*, 36 Cal.App.2d 403 [97 P.2d 1014].) In the instant case this question has been resolved against Greenbach by the trial court, and its determination is amply supported. In modern times the courts have been quite reluctant to hold that, as a matter of law, negligent reliance on deliberate fraudulent representations constitute laches. In "A Treatise in Equity" by Walsh at page 491 the modern view is stated as follows: "There is no doubt that the plaintiff cannot recover if the facts were apparent so that he could be misled only as a result of ignoring what any average person should have observed and understood. Nevertheless the rule laid down in some of the earlier cases that the plaintiff must have investigated with reasonable care, and if he has been negligent in relying on the defendant's false statements he cannot recover, are very much modified by later cases. Whether or not the plaintiff was negligent in relying upon the truth of the defendant's representations seems to be immaterial. If under the facts, because of the relation of the parties, involving trust and confidence, or because the representor was in a position to know the facts which was definitely superior to that of the representee, or where an investigation by the representee could not be easily made, the courts hold that he was justified in relying on the truth of the false statements." That California has adopted this modern view, see *Hefferan* v. *Freebairn*, 34 Cal.2d 715 [214 P.2d 386].

The California courts have held that there is no duty of inquiry unless the circumstances are such that inquiry becomes a duty and the failure to make it a negligent omission. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 438 [159 P.2d 958]; see, also, *Laraway* v. *First Nat. Bk. of La Verne*, 39 Cal.App.2d 718, 730 [104 P.2d 95]; *Anderson* v. *Thacher*, 76 Cal.App.2d 50, 71 [172 P.2d 533]; *Lewis* v. *Beeks*, 88 Cal.

App.2d 511, 520 [199 P.2d 413]; see annotation 33 A.L.R. 853, particularly p. 902, et seq.)

The problem of the statute of limitations in such actions has been so recently reviewed by the Supreme Court in the Hobart case, *supra*, pages 436-439, that it is not necessary to repeat what was there said, except to repeat the conclusion of the court. At page 439 appears the following: ''The reason for the rule is well stated in *Victor Oil Co.* v. *Drum, supra* (184 Cal. at p. 241): 'The courts will not lightly seize upon some small circumstance to deny relief to a party plainly shown to have been actually defrauded against those who defrauded him on the ground, forsooth, that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with a discovery in advance of actual knowledge on his part.' It follows that plaintiff is not barred because the means of discovery were available at an earlier date *provided* he has shown that he was not put on inquiry by any circumstances known to him or his agents at any time prior to the commencement of the three-year period ending June, 1941.''

From the above authorities it is quite clear that the statute of limitations or laches cannot be held, as a matter of law, to bar the present action. The finding that the bank acted with reasonable diligence is amply supported. The further finding that Greenbach had not, since the execution of the settlement, changed his position in any way that would justify denying recovery, is also amply supported. This being so, there is no merit to Greenbach's defense that, as a matter of law, he was entitled to a nonsuit because of the statute of limitations or laches.

### THE BANK'S APPEAL

The appeal of the bank is based on the contention that the amount of the judgment, as a matter of law, is incorrect. It will be remembered that the settlement agreement was entered into in February, 1940. The judgment then settled was dated November 17, 1939, and was for $88,050.66. Interest on this judgment had accrued. When the bank commenced this action in November, 1945, it prayed that the court set aside the settlement and give judgment against Greenbach for the full amount of this judgment, less the $5,000 received in the settlement, with interest from November 17, 1939. The trial court's judgment was not in accord with the prayer.

In the first paragraph of the judgment it decreed that "the agreement of settlement . . . be, and the same is hereby cancelled, set aside and annulled"—the normal provision in a successful rescission action. But in the second paragraph, instead of expressly reinstating the judgment, it granted a money judgment of $24,300, with interest from February 5, 1940. It is from this portion of the judgment that the bank appeals.

The trial court arrived at the amount of the money judgment by finding that the net worth of Greenbach, at the date of the settlement, including his interests in the corporations made defendants in this action, was $100,000; that on that date Greenbach was indebted to other creditors; that the proportion that the bank's judgment bore to Greenbach's total indebtedness was .293 per cent; that if all of Greenbach's assets on February 5, 1940, had been liquidated and applied to his debts, the bank would have received $29,300; that the $5,000 paid by Greenbach as part of the settlement should be credited against this amount; that therefore the bank was damaged as a result of the fraudulent representations in the amount of $24,300.

The trial court arrived at this unusual result apparently because it was impressed by some dicta in the case of *Greenawalt* v. *Rogers,* 151 Cal. 630 [91 P. 526]. That case, like the instant one, involved an action to set aside the settlement of a judgment on the ground of the debtor's alleged fraudulent misrepresentations as to his assets. The judgment, at the time of settlement, was worth about $3,500. The settlement was made for $100, and was entered into upon the representation of the debtor that he could pay but $100 on the judgment. The trial court found that, as a matter of fact, at the time of settlement, the debtor owned some property worth $400, and it granted judgment to the creditor for the full amount of the original judgment, plus interest, less the $100 paid. This was reversed by the Supreme Court. The ground of the reversal was that there was no misrepresentation of a material fact, and no showing that the plaintiff would not have consented to the settlement even if he had known of the property. The Supreme Court emphasized the fact that the debtor had not stated that he owned no other assets, but had merely stated that he was able to pay but $100 on the judgment. The court also pointed out, in emphasizing the unimportance of the misrepresentation that, because the debtor owed other creditors about $11,000, it was

doubtful whether the creditor could have recovered anything had he not agreed to the settlement. In this connection the Supreme Court used the language which seems to have impressed the trial court in the instant case. At page 636 it is stated: "The judgment satisfied amounted at the time of the settlement to about thirty-five hundred dollars. This was less than one-fourth of the total indebtedness of Rogers. If, therefore, this lot, which is the only property found by the court to have been owned by him, had been applied to the payment of his debts *pro rata*, whether by voluntary agreement or through the bankruptcy proceedings which, as the complaint alleges, the defendant was contemplating, the share which plaintiff . . . could have received would have been less than the one hundred dollars which they did in fact receive."

This holding cannot be distorted into a holding that in a rescission action the creditor is limited to a *pro rata* judgment in the amount that he could have collected had the debtor liquidated all of his assets on the date of the settlement. All that was held in the above cited case was that the misrepresentation was not as to a material fact, and the above language was used to demonstate that.

There is no authority cited, and no logical argument made, that support the conclusion that a creditor, fraudulently induced to enter into a settlement of his claim upon material misrepresentations as to assets, can or should be limited, in a rescission action, to a judgment for the *pro rata* share of the assets of the debtor as they existed on the date of settlement. The cancellation of an agreement of settlement necessarily has the effect of placing the parties where they were before the settlement was made. It is as if the settlement had never been made. Authorities are legion and uniform to the effect that the legal effect of a rescission is to restore both parties to their former position as far as possible. (3 Pomeroy, Equity Jur. (5th ed.) 578; 3 Black on Rescission and Cancellation, p. 1660, § 700; 15 C.J.S. p. 767, § 43.) The authorities also agree that, concurrent with the award of rescission, the trial court may award money damages or order such other relief as justice may require. (4 Cal.Jur. p. 797, § 29.) In the present case the court canceled the settlement agreement. It should then have reinstated the original judgment. The amount of that judgment is fixed and certain. Perhaps a money judgment in the precise amount of the original judgment would have been proper. In any event, the purpose of the decree, whatever its form, is to restore, so far as possible, the *status quo*.

That means the return to each party, so far as possible, of the property that he parted with at the time of the settlement. (Civ. Code, § 1691(2); *Spreckels* v. *Gorrill*, 152 Cal. 383, 392 [92 P. 1011]; *Perkins* v. *Farmer etc. Sav. Bank*, 12 Cal.App.2d 495, 499 [55 P.2d 524]; *Arthur* v. *Graham*, 64 Cal.App. 608, 612 [222 P. 371].)

The result worked out by the trial court is inequitable and immoral. It compels the bank to accept a *pro rata* division of assets as of 1940, and deprives it of the many alternatives it might have exercised in that year other than dividing up the assets. The bank could, for example, had the fraud not been practiced, waited to see what some of the other creditors were going to do. Some might and did settle for less than their *pro rata* share, and some claims might have become barred by the statute of limitations. The bank might have contested some of the claims. It might have assisted Greenbach to become solvent. In any of these events, its proportional share of the assets would be increased. The judgment, as rendered, deprives it of these alternatives.

The solution worked out by the trial court places a premium on and encourages fraud. Such a decree encourages a debtor fraudulently to conceal his assets, because, even if caught, he will only have to pay the amount of the assets he held at the time of the fraud. That is not sound public policy. On the other hand, restoration of the original judgment merely restores the creditor to his original position. It is not inequitable to the fraudulent debtor because it merely places him subject to the original obligation which burdened him and would have continued save for the fraud.

It should also be pointed out that in the instant case, whatever the law may be generally, the judgment violates the terms of the settlement agreement. By that contract Greenbach agrees that:

"I definitely understand and agree that said Bank shall be bound by said settlement and by its acceptance of said $5,-000.00 settlement, only upon the condition that the statements herein made by me as to my personal responsibility and as to my assets, are true.

"I further agree that in the event of a rescission of this settlement, the said Bank may retain the sum received hereunder and apply said sum on account of the original obligation, and further waive the right to plead the Statute of Limitations as a defense to said original obligation."

Thus, by the very terms of the settlement agreement the bank was given a contract right to have the original judgment restored in the event of a rescission. The portion of the judgment under discussion clearly violates this provision of the agreement.

Greenbach argues that section 3343 of the Civil Code controls the measure of damages in a rescission action. That section provides that one defrauded in the purchase of property is entitled to recover the difference between the actual value of that which he received, together with any additional damage arising from the transaction. The section concludes with this language: "Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled." Thus, the section is limited to actions for damages for fraud and deceit, and specifically excludes "equitable" remedies, one of which is the remedy of rescission. (*Bagdasarian* v. *Gragnon,* 31 Cal.2d 744, 763 [192 P.2d 935] ; see, also, *Hefferan* v. *Freebairn,* 34 Cal.2d 715 [214 P.2d 386].)

On the appeal of the defendants the judgment is affirmed; on the appeal of the bank, that portion of the judgment appealed from is reversed, the bank to recover its costs on both appeals.

Bray, J., and Schottky, J. pro tem., concurred.